**MICROSOFT CORPORATION,**
a Washington corporation,
Plaintiff,

v.

**COMPUSOURCE DISTRIBUTORS,**
**INC.** a Michigan Corporation, and
Does 1–10, et al., Defendants.

No. 99–71369.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 28, 2000.

Kathleen A. Lang, Dickinson, Wright, Bloomfield Hills, MI, Theresa A. Orr, Scott A. MacGriff, Dickinson, Wright, Detroit, MI, for Microsoft Corp.

Joan H. Lowenstein, Seeligson & Jordan, Ann Arbor, MI, for Compusource Distributors, Inc.

James R. Lilly, Plunkett & Cooney, Detroit MI, Milind Parekh, Novara, Tesija, Southfield, MI, for Hartford Cas. Ins. Co., Inc.

### OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BORMAN, District Judge.

Before the Court is Plaintiff's motion for summary judgment (Docket Entry # 18). The Court heard oral argument on this motion on April 12, 2000. Upon consideration of the motion, the submissions of the parties, and the applicable law, the Court grants summary judgment for Plaintiff.

### I. BACKGROUND

Plaintiff Microsoft Corporation ("Microsoft") filed the instant action against Defendant Compusource Distributors, Inc. ("Compusource"[1]), alleging that Compu-

---

1. Microsoft has also named as defendants Does 1–10 who were at all relevant times shareholders or officers of Compusource. However, the term "Compusource" will refer to all defendants in this action.

source distributed counterfeit Microsoft software and hardware. Microsoft is a Washington corporation focused primarily on developing software and licensing it to various purchasers. (Compl.¶ 4.) Compusource is a Michigan corporation that distributes computer hardware to resellers and some end-users. (Alan Lucia Dep. at 12:11.)

Microsoft claims that Compusource infringed Microsoft's registered copyrights in the following computer software, including user's reference manuals, user's guides, and screen displays: (1) Microsoft's Windows 95, (2) Microsoft's Windows 98, (3) Microsoft's Office Pro 97, (4) Microsoft Access 97, (5) Microsoft Excel 97, (6) Microsoft Outlook 97, (7) Microsoft PowerPoint 97, (8) Microsoft Word 97, and (9) Microsoft's Windows NT Workstation.[2] Microsoft also claims that Compusource infringed a number of its federally registered trademarks: (1) "MICROSOFT", (2) "WINDOWS", (3) WINDOWS FLAG LOGO, (4) COLORED WINDOWS LOGO, (5) PUZZLE PIECE LOGO, (6) "POWERPOINT", (7) "MICROSOFT ACCESS", (8) "BOOKSHELF", and (9) "WINDOWS NT".[3]

The facts of this case are not in dispute. Compusource had been registered with Microsoft's System Builder Program (formerly known as the Delivery Service Partner ("DSP") program)[4] since April 8, 1997.

2. Microsoft registered the software at issue with the United States Copyright Office and received the following registration numbers: (1) Microsoft's Windows 95, U.S. Copyright Reg. No. Txu 649–511; (2) Microsoft's Windows 98, U.S. Copyright Reg. No. TX 4–687–920; (3) Microsoft's Office Pro 97, U.S. Copyright Reg. No. TX 4–395–984; (4) Microsoft Access 97, U.S. Copyright Reg. No. TX 4–395–639; (5) Microsoft Excel 97, U.S. Copyright Reg. No. TX 4–395–640; (6) Microsoft Outlook 97, U.S. Copyright Reg. No. TX 4–395–686; (7) Microsoft PowerPoint 97, U.S. Copyright Reg. No. TX 4–395–685; (8) Microsoft Word 97, U.S. Copyright Reg. No. TX 4–395–687; and (9) Microsoft's Windows NT Workstation, U.S. Copyright Reg. No. TX 4–395–740.

3. Microsoft registered the trademarks at issue with the United States Patent and Trademark Office as follows: (1) Trademark Reg. No. 1,256,083 issued November 1, 1983 ("MICROSOFT") for computer hardware and software manuals, newsletters and computer documentation; (2) Trademark Reg. No. 1,872,264 issued January 10, 1995 ("WINDOWS") for computer programs and manuals sold as a unit; (3) Trademark Reg. No.1,200,236 issued July 6, 1982 ("MICROSOFT") for computer programs and computer programming services; (4) Trademark Reg. No.1,816,354 issued January 11, 1994 (WINDOWS FLAG LOGO) for computers, computer peripherals, and computer programs and manuals sold as a unit; (5) Trademark Reg. No.1,815,350 issued January 4, 1994 (COLORED WINDOWS LOGO) for computers, computer peripherals, and computer programs and manuals sold as a unit; (6) Trademark Reg. No.1,982,562 issued June 25, 1996 (PUZZLE PIECE LOGO) for computer programs and instruction manuals sold as a unit; (7) Trademark Reg. No.1,475,795 issued February 9, 1988 ("POWERPOINT") for pre-recorded computer programs recorded on magnetic disks; (8) Trademark Reg. No.1,741,086 issued December 22, 1992 ("MICROSOFT ACCESS") for computer programs for use with data bases and manuals sold as a unit; (9) Trademark Reg. No. 1,592,783 issued April 24, 1990 ("BOOKSHELF") for computers, computer programs and manuals sold therewith; and (10) Trademark Reg. No.1,955,219 issued February 6, 1996 ("WINDOWS NT") for computer programs, namely operating system programs including an operating environment and instructional manuals sold as a unit.

4. Microsoft's System Builder Program, which was known as the Delivery Service Partner program before May 1, 1998, allows entities and individuals who assemble personal computers ("computer system builders") to obtain genuine Microsoft software and hardware from authorized distributors known as Delivery Service Partners or, more currently, as Original Equipment Manufacturers (OEM) Authorized Distributors (referred to herein as "DSPs"). (*See* Tamara Sellers Decl. ¶ 26, Def. Ex. E.) Computer system builders who register in the System Builder Program can only replicate, reproduce, and/or distribute Microsoft software in accordance with the terms of written license agreements applicable to each software package. (*See id.* at ¶ 27.) Once registered in the System Builder Program, computer system builders receive regular communications from Microsoft by mail and facsimile concerning Microsoft's distribution programs and methods to assure against dealing in counterfeit Microsoft software and hardware. (*See id.*).

On August 25, 1997, an investigator ordered by telephone from Compusource three units of Microsoft Windows 95 software for $71.00 each, three units of Microsoft Windows NT Workstation, Version 4.0 software for $120.00 each, and three units of Microsoft Serial Mouse hardware for $20.00 each. (*See* Gilbert Egbert Decl., ¶ 2; Def. Ex. J.) Shortly thereafter, the investigator's office received these products from Compusource. (*See* Robert Holmes Decl., ¶ 3–4 & Ex. 1; Def. Ex. H.) Microsoft then analyzed these units and determined them to be counterfeit and infringing. (*See* Tamara Sellers Decl. ¶¶ 4–12; Def. Ex. E.)

After learning that Compusource sold counterfeit software and hardware, Microsoft sent Compusource a certified letter on September 30, 1997 requesting that it cease and desist distributing counterfeit Microsoft products, and offered suggestions on how to ensure compliance, such as by obtaining products from DSPs. (*See* Deposition of Alan Lucia ("Lucia Dep."), at 90:10 to 91:2 & Ex. 34; and Laurie Stein Decl. ¶ 2, Ex. 1, Def. Ex. G.) However, after receiving the letter, Compusource continued to distribute counterfeit Microsoft software. On or about January 6, 1999, an investigator acquired counterfeit copies of Microsoft Windows 98 and Microsoft Office 97 (Professional Edition) ("Office Pro 97")[5] from Compusource. (*See* Egbert Decl. ¶ 3; Mike Duffield Decl. ¶¶ 3–4 & Ex. 1, Def. Ex. I; Sellers Decl. ¶¶ 13–18.) Additionally, on March 2, 1999, an investigator acquired counterfeit copies of Microsoft Windows 98 software from Compusource. (*See* Steve Schlanger Decl. ¶ 2, Def. Ex. K; Duffield Decl. ¶¶ 5–6 & Ex. 2; Sellers Decl. ¶¶ 19–21.)

During his deposition, Alan Lucia, the president of Compusource,[6] admitted that he continued to acquire purported Microsoft software and hardware from suspect sources after receiving the cease and desist letter. (*See* Lucia Dep. at 96:19 to 96:21.) Mr. Lucia testified that at the time he received the cease and desist letter, he believed that a company named "Software Plus" provided Compusource with the counterfeit software that the investigator ultimately received. (*See* Lucia Dep. at 91:10—92:13.) Lucia stated that Software Plus engaged in suspect business practices, such as selling purported Microsoft software and hardware at prices well below the prices charged by authorized Microsoft distributors. and distributing purported Microsoft "Certificates of Authenticity" ("COAs") as separate items.[7] (*See id.* at 93:10–18, 99:13–16, 103:1–8, & Ex. 37.)

Upon receiving Microsoft's cease and desist letter, Lucia testified that he faxed a copy to his attorney, and telephoned his two primary software vendors, Software Plus and DICO, to discuss the matter with

---

**5.** Office Pro 97 is a group of Microsoft's programs comprising Microsoft Access 97, Microsoft Excel 97, Microsoft Outlook 97, Microsoft PowerPoint 97, and Microsoft Word 97. (Compl.¶ 14.)

**6.** Lucia does not own any stock in Compusource. However, his wife, Evet, holds fifty percent (50%) of Compusource's stock. (*See* Lucia Dep. at 10:7–13.) Lucia is Compusource's president and is responsible for all of its day-to-day management and operation. (*Id.* at 24:21–26:17), and appeared as Compusource's designated witness pursuant to FED. R. CIV. P. 30(b)(6).

**7.** Microsoft uses security features in its packaging and components to make the unauthorized duplication of Microsoft software and components difficult. (*See* Sellers Decl. ¶ 6.) One such feature is the Certificate of Authenticity ("COA"). (*See id.*) If genuine, the COA on software and components can be traced to identify the type of software package to which it had been affixed when first distributed by Microsoft, as well as the entity to whom it was first shipped. (*See id.*) This allows Microsoft to trace certain software and components, and to combat software piracy. (*See id.*) Microsoft asserts that, given that the sole purpose of a COA is to authenticate software, there is no legitimate reason to distribute a COA separate from the software. it authenticates. Microsoft maintains that the acquisition or distribution of "stand alone" COAs evidences that someone intends to distribute the COAs with or affixed to counterfeit and infringing software in an attempt to fraudulently mask it as genuine software.

them. (*See* Lucia Dep. at 91:11–21). Lucia received verbal assurances from these vendors that the software products were legitimate. Lucia did not request that the vendors provide any written documentation to show that the products were not counterfeit or that they had any written license agreements with Microsoft. (*See id.* at 92:18–24). Lucia testified that his non DSP vendors explained to him that they could sell genuine products cheaper than DSPs because they bought on the "gray" market, meaning that if a computer retail company goes out of business, they would buy up their existing inventory and then resell it. (*See id.* at 93:16–94:21.)

Nevertheless, after receiving Microsoft's cease and desist letter, Compusource continued to acquire many of the same items from Software Plus. (*See id.* at 92:14–24, 96:19–21.) Lucia also admitted that Compusource acquired purported Microsoft software and hardware from several unauthorized suppliers both before and after receipt of the cease and desist letter. (*See id.* at 96:19–21; Sellers Decl. ¶ 29).

Compusource's business records indicate that its overall distribution volume from March 1997 through March 1999 was approximately 1,790 units of suspect and/or counterfeit Microsoft Windows 95, Windows 98, Windows NT Workstation 4.0, and Office Pro 97 software. This comprises 295 units of Windows 95, 133 units of Windows 98, 414 units of Windows NT Workstation 4.0, and 952 units of Office Pro 97. (*See* Lucia Dep, at 41:13–42:13.)

On March 19, 1999 Microsoft filed the instant action against Compusource alleging claims of copyright infringement; trademark infringement; false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125 *et seq;* violation of the Michigan Consumer Protection Act, MICH. COMP. LAWS ANN. § 445.903; and Michigan common law unfair competition. On December 2, 1999 Microsoft filed the instant motion for summary judgment. Following oral argument on the motion at bar, the Court entered a Stipulated Permanent Injunction Against Defendant Compusource Distributors, Inc (Docket Entry # 44).

## II. STANDARD OF REVIEW

The Court may properly grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Blankenship v. Parke Care Centers,* 123 F.3d 868, 871–72 (6th Cir.1997), *cert. denied,* 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105, (1998). The Court is directed to view the evidence in the light most favorable to the nonmoving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party initially has the burden to advise the Court of the basis for the summary judgment motion and of demonstrating that the record shows no material issue of fact exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, "the mere existence of a scintilla of evidence" in support of the non-moving party is not sufficient; a genuine issue for trial is presented when there is sufficient "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## III. LEGAL STANDARDS FOR PLAINTIFF'S CLAIMS

### A. Copyright Infringement

To establish a claim of copyright infringement, a plaintiff must demonstrate (1) ownership of a valid copyright and (2) "copying" by the defendant. *See Ellis v. Diffie,* 177 F.3d 503, 506 (6th Cir.1999) (citations omitted). Under section 106 of the Copyright Act of 1976, the copyright

owner alone has the exclusive right to reproduce the copyrighted work, to prepare derivative works based upon the copyrighted work, and·to distribute copies of the work. *See* 17 U.S.C. §§ 106(1), (3). Violation of any of these rights constitutes infringement. *See id.* at § 501(a).

■ Lack of knowledge of the copyright infringement is neither an element of the plaintiff's case nor a defense to infringement. *See, e.g., Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 829 (8th Cir.1992) (a defendant's liability for copyright infringement is absolute regardless of intent or state of mind); *Fitzgerald Publishing Co. v. Baylor Publishing Co.*, 807 F.2d 1110, 1113 (2d Cir.1986) ("intent or knowledge is not an element of infringement."). The state of mind of the infringer is relevant, if at all, only when considering damages. *See Cass County Music Co. v. C.H.L.R., Inc.*, 88 F.3d 635, 637 (8th Cir.1996).

### 1. Proof Regarding Ownership of Copyrights

Copyright registration certificates are presumptive evidence of a plaintiff's ownership of valid copyrights. *See* 17 U.S.C. § 410(c); *Hi–Tech Video Productions, Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1095 (6th Cir.1995). This presumption may be rebutted upon a showing by the party challenging the copyright. *See Hi–Tech Video Productions, id.*

The copyrights in the Microsoft software at issue in this case—Microsoft Windows 95, Microsoft Windows 98, Microsoft Windows NT Workstation 4.0, and Microsoft Office Pro 97 (which includes Microsoft Access 97, Microsoft Excel 97, Microsoft Outlook 97, Microsoft PowerPoint 97, and Microsoft Word 97 software)—were prop-

erly. registered with the United States Copyright Office. *See* n. 2 *supra.* Compusource has not contested the validity of these copyrights.

### 2. Proof of Lack of Authorization of Compusource's Use or Distribution of Microsoft's Registered Copyrighted Software ·

■ Although Compusource has been registered in Microsoft's System Builder Program since April 8, 1997, Compusource did not obtain the software and hardware at issue here from a Microsoft "Delivery Service Partner." Defendant's business records show that, apart from five units of Windows 95 software obtained from Synnex Information Technologies, Inc., all of the purported Microsoft Windows 95, Windows 98, Windows NT Workstation 4.0, and Office Pro 97 software, and all of the Microsoft Serial Mouse hardware that Compusource obtained between March 1997 and March 1999 was obtained from unauthorized (non-DSP) distributors. · (*See* Sellers Decl. ¶ 29).

The undisputed evidence before the Court demonstrates that Compusource infringed Microsoft's valid copyrights in Microsoft Windows 95, Microsoft Windows 98, Microsoft Windows NT Workstation 4.0, and Microsoft Office Pro 97 (which includes Microsoft Access 97, Microsoft Excel 97, Microsoft Outlook 97, Microsoft PowerPoint 97, and Microsoft Word 97 software). Moreover, Compusource does not contend that it did not infringe these copyrights.

### B. Trademark Infringement

■ In order to defeat summary judgment in a Lanham Act case alleging violations of sections 32[8] and 43,[9] a defendant

---

8. Section 32, or 15 U.S.C. § 1114(1), provides, in relevant part:

Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive

... shall be liable in a civil action by the registrant....

9. Section 43, or 15 U.S.C. § 1125(a)(1), provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of

"must raise a genuine issue of fact as to (1) whether their use of the trademark was without the registered owner's consent, or (2) whether their unauthorized use was likely to cause confusion in the marketplace as to the origin or sponsorship of the product." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1188–89 (6th Cir.1997). A plaintiff need not prove intent to infringe to prove a defendant's liability. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 287 (6th Cir.1997); *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir.1993). Intentional infringement, however, will lead to enhanced statutory damages. *See* 15 U.S.C. § 1117(c).

■ To establish a claim of trademark infringement under section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), a plaintiff must be able to show (1) the mark is valid and owned by the plaintiff; (2) that the defendant is using the same or similar mark; (3) "in commerce," and (3) the use of the mark by the defendant is likely to cause confusion. *See* 15 U.S.C. § 1114(1)(a); *see also Pita Delight, Inc. v. Salami*, 24 F.Supp.2d 795, 799 (E.D.Mich. 1998) (Zatkoff, J.) (citing *Star Financial Services, Inc. v. Aastar Mortgage Corp.*, 89 F.3d 5, 9 (1st Cir.1996)).

### 1. Proof of Ownership of Registered Marks and Microsoft's Prior Use

Microsoft has registered the marks at issue in the United States Patent and Trademark Office on the Principal Register. (*See supra*, n. 3; Sellers Decl. ¶ 23.) These registrations are conclusive evidence of Microsoft's exclusive right to the use of the marks for purposes of 15 U.S.C. § 1114(1). *See* 15 U.S.C. § 1057(b); *Allard Enterprises, Inc. v. Advanced Pro-*

*gramming Resources, Inc.*, 146 F.3d 350, 356–57 (6th Cir.1998).

### 2. Proof of Lack of Authorization of Compusource's Use or Distribution of Microsoft's Registered Trademark or Copyrighted Goods

Microsoft has demonstrated that Compusource obtained the software at issue in this case from unauthorized (non-DSP) distributors. (*See* Sellers Decl. ¶ 29.)

### 3. Proof of "In Commerce" Element

Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), requires a showing by a plaintiff/owner of a registered mark that the defendant used or intended to use the plaintiff's mark "in commerce." *See* 15 U.S.C. § 1114(1). Microsoft's products are distributed in all fifty states and throughout the world. (*See* Sellers Decl. ¶ 25.) In addition, the uncontroverted evidence shows that Compusource sold infringing products to Microsoft's investigators.

### 4. Likelihood of Confusion

To prevail on a motion for summary judgment in a Lanham Act trademark infringement claim, a plaintiff must prove that the purportedly infringing mark is "likely to cause confusion" in prospective purchasers' minds. *See* 15 U.S.C. § 1114; *Daddy's Junky Music*, 109 F.3d at 280 (calling the key question "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties"). The Sixth Circuit has identified eight factors to determine the likelihood of confusion inquiry:

1. strength of the plaintiff's mark;
2. relatedness of the goods;

origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activ-

ities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

3. similarity of the marks;

4. evidence of actual confusion;

5. marketing channels used;

6. likely degree of purchaser care;

7. defendant's intent in selecting the mark;

8. likelihood of expansion of the product lines.

*Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 648 (6th Cir.1982).

In the case at bar, the undisputed evidence shows that Compusource has offered and distributed purported Microsoft software and hardware which bear imitations of Microsoft's registered trademarks and logos and in other respects appear to resemble genuine Microsoft software and hardware. (*See* Sellers Decl. ¶¶ 4–21.) In so doing, Compusource has represented to the public that the software and hardware it sold were in fact genuine Microsoft software when, in fact, they were not. Where, as here, goods distributed by a defendant are virtually identical to the trademark owner's goods, likelihood of confusion is established. *See, e.g., WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1086 (6th Cir.1983).

## C. Liability for False Designation of Origin

■ A claim for false designation of origin under section 43 of the Lanham Act arises when a person uses in commerce a word, term, name or symbol, or a false or misleading description or representation of fact which is likely to cause confusion or to deceive as to the origin, sponsorship or approval of goods. 15 U.S.C. § 1125(a)(1). To establish a claim for false designation of origin, a plaintiff must demonstrate that (1) the false designation has a substantial economic effect on interstate commerce; and (2) the false designation creates a likelihood of confusion. *See Johnson v. Jones,* 149 F.3d 494, 502 (6th Cir.1998). Based on the uncontested facts identified *supra,* Compusource is liable for false designation of origin.

## D. Liability for Unfair Competition

■ The Michigan Consumer Protection Act ("MCPA") prohibits "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." MICH. COMP. LAWS ANN. § 445.901–445.922. The applicable standard under the MCPA and under Michigan common law is the same as the tests for federal trademark infringement and federal unfair competition under 15 U.S.C. §§ 1114(1) and 1125(a): whether confusion is likely. *See Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1105 n. 1 (6th Cir.1991). Accordingly, based on the undisputed facts of this case, Compusource is liable for unfair competition under Michigan law based on the same activities which violate the Lanham Act.

## IV. DEFENDANT'S BUSINESS DEALINGS

## A. Compusource's Knowledge and Willful Blindness

Compusource's business dealings reveal its apparent knowledge that the purported Microsoft software and hardware it was distributing was counterfeit. At a minimum, its conduct represents reckless disregard for Microsoft's intellectual property rights. The evidence supporting these findings is not in dispute.

## 1. Knowledge of Legitimate Products

The record demonstrates that Compusource should have known how to obtain genuine and authorized Microsoft software and hardware throughout the relevant time period. Lucia admitted that Compusource has been registered in Microsoft's System Builder program since 1996, and that he has regularly received the faxes and mail announcements Microsoft sends to its program members regarding, *inter alia,* how to ensure that the software one obtains is genuine and authorized. (*See* Lucia Dep. at 28:25–29:15, 95:16–21; Sellers Decl. ¶ 27.) In fact, Compusource ob-

tained five units of genuine Microsoft Windows 95 software from an authorized Microsoft DSP (Synnex Information Technologies, Inc.) in October of 1997. Lucia admitted during deposition that Compusource *consciously* avoided ordering from DSPs because it could obtain purported Microsoft software and hardware at much lower prices from unauthorized (non-DSP) suppliers. (*See* Lucia Dep. at 92:25–93:9.) In light of its familiarity and experience with the System Builder program and how to obtain genuine and authorized software from DSPs, Compusource's persistent use of its unauthorized suppliers demonstrates, at the very least, a reckless disregard for the legitimacy of the software and hardware it was receiving.

### 2. *Willful Blindness*

In addition, Compusource appeared to turn a blind eye to clear indications that its unauthorized suppliers were distributing counterfeit and infringing software and hardware. First, Compusource was aware that the prices charged by its unauthorized suppliers for purported Microsoft software and hardware were considerably lower than the prices charged by DSPs. (*See* Lucia Dep. at 93:4–18.) At his deposition, Lucia stated by way of example that a single unit of Windows 95 would cost about $85 if obtained from a DSP, and about $50 if obtained from one of its unauthorized suppliers. (*See id.* at 93:16–18.) Lucia admitted that he was so surprised by how much lower the prices were that he asked some of Compusource's non-DSP suppliers for an explanation. (*See id.* at 93:19–22.) According to Lucia, the typical response was that the units could be sold at low prices because they had been obtained for below market prices from business that were failing and had to dispose of their inventory. (*See id.* at 94:3–95:2.) Microsoft questions the veracity of this explanation given that Compusource's suppliers were consistently able to provide large-scale distributions of several types of purported Microsoft software and hardware at too-good-to-be-true prices for years at a time. Microsoft contends, and the Court agrees, that the constant availability of units at inordinately low prices, combined with Microsoft's reminders that prices below those offered by DSPs should be considered suspect in should have put Compusource on notice that it was unlikely that its unauthorized suppliers were distributing genuine Microsoft software and hardware.

Second, some of Compusource's suppliers frequently used codes on their invoices, rather than actual descriptions, to identify purported Microsoft software and hardware. For example, DICO/Davan International rarely included on its invoices actual descriptions of the units being distributed, and instead used mysterious codes such as "Psdh–N1" to identify purported Microsoft software. (*See* Lucia Dep. at 118:18–128:20 & Ex. 59.) Similarly, Express Com typically either used an equally suspicious code to describe purported Microsoft software and hardware on its invoices, or provided no description at all of the units being distributed. (*See* Lucia Dep. at 128:25–139:21 & Ex. 60.) This reluctance to provide actual descriptions on invoices sent to Compusource supports Microsoft's assertion that these suppliers were trying to disguise their distributions of purported Microsoft software and hardware. Moreover, Express Com appears to have used descriptions of non-Microsoft hardware on some invoices to identify what in actuality was purported Microsoft software. (*See* Lucia Dep. at 134:4–138:6 & Ex. 60.) For example, Lucia admitted that he believed the 60 units described as "Key Board" on Express Com invoice number 2093 (dated 3/31/98) were most likely units of Microsoft Windows 95 software. (*See* Lucia Dep. at 134:10–14 & Ex. 60.) This seems to indicate an intent to disguise the true nature of the distribution and these suspect business practices should have put Compusource on notice that the suppliers were not distributing genuine Microsoft software and hardware.

Third, Compusource obtained from several of its suppliers, and redistributed,

units of stand-alone purported Microsoft Certificates of Authenticity ("COAs"). Microsoft contends that since the sole purpose of a Microsoft COA is to authenticate the software or hardware with which it is distributed, there is no circumstance under which a COA should be distributed separate from he software or hardware it authenticates and there is *no* legitimate reason to do so. (*See* n. 7, *supra.*) Lucia testified that Compusource acquired stand-alone units of purported Microsoft COA from several suppliers for distribution separate from any related software or hardware. (*See* Lucia Dep. at 73:21–75:16, 81:2–82:2, 103:18, 116:20–25 & Ex. 17, 24, 37, 55.) Lucia could not provide any explanation or legitimate reason for such distributions of stand-alone Microsoft COAs separate from any Microsoft software or hardware. (*See* Lucia Dep. at 74:10–21, 81:14–19.) These activities demonstrate that Compusource at least acted with reckless disregard for Microsoft's intellectual property rights, and more likely acted with full knowledge that it was an eager and willing participant in infringing activities.

Finally, and most telling, Compusource received a cease and desist letter *confirming* that software and hardware it acquired from its unauthorized suppliers and redistributed was counterfeit and infringing. (*See* Stein Decl., Ex. 1; Lucia Dep. at 90:10–91:3 & Ex. 34.) Yet, after receiving this letter, Lucia only telephoned his two primary software vendors, Software Plus and DICO, to discuss the matter with them. (*See* Lucia Dep. at 91:11–21). Nevertheless, Compusource continued to use these same suppliers without making any attempt to investigate their assurances that they were distributing genuine Microsoft software and hardware. (*See* Lucia Dep. at 90:14–92:24, 96:6–21.)

### B. Scope of Illegal Distribution Activities.

Compusource's business records and Lucia's deposition testimony support a total distribution of at least 1,790 units of purported Microsoft software and hardware. (*See supra.*) Microsoft contends that it is impossible to locate and examine each of these 1,790 units distributed by Compusource.

Courts are often called upon to determine the degree to which a defendant has engaged in the distribution of counterfeit products based upon a limited data. For example, in *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614 (9th Cir.1993), the plaintiff made undercover purchases of computer products from the defendant. The great majority of the purchased products were counterfeit. At trial, the defendant did not seek statutory damages but instead sought actual damages. In determining actual damages, the court extrapolated the total number of counterfeit products sold by defendant based on the percentage of counterfeit products in the total number of products purchased during plaintiff's undercover operation. Because the majority of products purchased by the plaintiff were counterfeit, the court reasoned that the same percentage (95 percent) of similar products sold by the defendant were likewise counterfeit. On appeal, the Ninth Circuit affirmed noting, "[m]uch legal reasoning depends on that very kind of extrapolation from limited data." *Id.* at 621.

Similarly, in *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982 (11th Cir.1995), an inspection of the defendant's business premises revealed two pairs of counterfeit jeans. The inspection also revealed documents, including invoices and suspicious letters, showing that the defendant had engaged in many other illegal transactions. Based upon this evidence, the court found that the defendant had "engaged in an illicit enterprise involving numerous transactions to manufacture and sell counterfeit [Levi] products." *Id.* at 984.

Here, as in *Intel* and *Levi Strauss*, the Court can extrapolate the degree to which Defendant distributed counterfeit and infringing Microsoft software and hardware based upon the evidence that Microsoft has obtained from Compusource. Microsoft acquired numerous counterfeit items

from Compusource. Microsoft has obtained invoices showing and deposition testimony of Defendant confirming that it distributed counterfeit and infringing Microsoft software and hardware on a large scale. In sum, the evidence shows that Compusource widely distributed counterfeit and infringing Microsoft software and hardware.

## V. COPYRIGHT AND TRADEMARK MISUSE

Compusource contends that it is not liable for copyright and trademark infringement because Microsoft is a monopolist, and misused its copyrights and trademarks. Compusource asserts that if it obtained counterfeit software from some distributors, that it was a natural result of Microsoft's anti-competitive policies.

█ In circuits where it is recognized, copyright misuse is a valid defense to claims of copyright infringement. *See Lasercomb America, Inc. v. Reynolds,* 911 F.2d 970, 977 (4th Cir.1990). To establish copyright misuse, a defendant must establish either "(1) that [the plaintiff] violated the antitrust laws, or (2) that [the plaintiff] illegally extended its monopoly beyond the scope of the copyright or violated the public policies underlying the copyright laws." *In re Independent Service Organizations Antitrust Litigation,* 85 F.Supp.2d 1130, 1175 (D.Kan.2000) (citing *Lasercomb America,* 911 F.2d at 978). The Sixth Circuit has neither accepted nor rejected the copyright misuse defense. *See Nat'l Football League v. Rondor, Inc.,* 840 F.Supp. 1160, 1168 (N.D.Ohio 1993).

No published or unpublished authority exists within the Sixth Circuit addressing the issue of "trademark misuse," and courts in other circuits have questioned the existence of this defense. *See Northwestern Corp. v. Gabriel Mfg. Co. Inc.,* No. 95 C 2004, 1998 WL 525431, *8, 48 U.S.P.Q.2d 1902 (N.D.Ill. Aug.19, 1998) ("if the defense of 'trademark misuse' even

exists, it is probably limited to misrepresentations . . .").

█ Aside from Mr. Lucia's deposition testimony stating that he found it "very difficult to make any type of profit on any Microsoft products" (Lucia Dep. at 92:25–93:6), Compusource presents no evidence to support its misuse defenses. Rather, in its brief in response to Microsoft's motion for summary judgment, Compusource cites Judge Thomas Penfield Jackson's findings of fact in *United States v. Microsoft,* 84 F.Supp.2d 9 (D.D.C.1999).

█ After the parties filed their briefs, and immediately before oral argument on the motion at bar, Judge Jackson issued his conclusions of law in *United States v. Microsoft,* 87 F.Supp.2d 30 (D.D.C.2000). Based on this recent opinion, this Court ordered supplemental briefing from the parties on how *United States v. Microsoft* affected Compusource's defenses of copyright and trademark misuse, if at all. Upon consideration of the supplemental briefs and the applicable law, this Court holds that Compusource has not demonstrated a genuine issue of material fact concerning its defense of copyright and trademark misuse.

As an initial matter, Compusource has not established that *United States v. Microsoft* collaterally estops Microsoft in the case at bar. *See Spilman v. Harley,* 656 F.2d 224, 229 (6th Cir.1981) ("the person asserting the estoppel has the burden of proving the requirements of estoppel have been met"). The Sixth Circuit requires [10] proof of five elements in order for the doctrine of collateral estoppel to apply:

(1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation,

(2) the issue was actually litigated and decided in the prior action,

---

10. Federal law of collateral estoppel controls cases premised on federal question jurisdiction. *See Blonder–Tongue Labs., Inc. v. University of Ill. Found.,* 402 U.S. 313, 324 n. 12, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

(3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation,

(4) the party to be estopped was a party to the prior litigation (or in privity with such a party), and

(5) the party to be estopped had a full and fair opportunity to litigate the issue.

*Hammer v. I.N.S.*, 195 F.3d 836, 840 (6th Cir.1999), *cert. denied* — U.S. —, 120 S.Ct. 1247, 146 L.Ed.2d 105 (2000). Compusource has not established these elements.

In addition, *United States v. Microsoft* does not at all address Microsoft's use of its trademarks. Assuming, *arguendo*, that the defense of "trademark misuse" exists, Compusource does not provide any evidence that Microsoft used its trademarks to violate the anti-trust laws of the United States. *See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 298 F.Supp. 1309, 1315 (S.D.N.Y.1969); *Phi Delta Theta Fraternity v. J.A. Buchroeder & Co.*, 251 F.Supp. 968, 971 (W.D.Mo.1966).

Moreover, assuming, *arguendo*, that *United States v. Microsoft* is applicable to the case at bar, Compusource has not demonstrated any causal nexus between any antitrust violation by Microsoft and Compusource's competitive position. Compusource is not a competitor of Microsoft; it does not write or create software. Rather, Compusource allegedly distributed counterfeit Microsoft software and related products.

Accordingly, the Court holds that Compusource has not raised any genuine issue of material fact regarding copyright or trademark misuse so as to preclude granting Microsoft summary judgment.

## VI. DAMAGES

Under the statutory damages provision of the Lanham Act, a trademark owner may elect, at any time before final judgment is rendered, to recover an award of statutory damages, rather than actual damages, for any use of a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services. *See* 15 U.S.C. § 1117(c). Similarly, under the Copyright Act, a "copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action." 17 U.S.C. § 504(c)(1).

■ Microsoft has exercised its rights to elect an award of statutory damages under each act. In so far as the Lanham Act and Copyright Act provide separate remedies for distinct injuries, Microsoft may seek damages under each Act. *See Nintendo of America, Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007, 1011 (9th Cir.1994) (in order to "effectuate the purposes of both statutes, damages may be awarded under both").

In addition to the recovery of statutory damages under the Copyright and Lanham Acts, a court "in its discretion" may award "a reasonable attorney's fee to the prevailing party" in addition to the costs under the Copyright Act. 17 U.S.C. § 505. The Lanham Act similarly provides for an award of costs, and in "exceptional" cases, attorney fees. *See* 15 U.S.C. § 1117(a).[11]

Courts have wide discretion in awarding statutory damages. *See Chi–Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1229 (7th Cir.1991) ("district courts enjoy wide discretion in awarding fees and may consider factors such as . . . 'the efficacy of the damages as a deterrent to future copyright infringement.'") (citations omitted). Under the Lanham Act, the present statutory minima and maxima are $500 and $1,000,000, respectively, for each counterfeit trademark. *See* 15 U.S.C. § 1117(c).

11. In addition to damages, a court may grant a copyright and/or trademark owner both permanent injunctive relief as well as impoundment and disposition of infringing articles. *See* 15 U.S.C. § 1118; 17 U.S.C. §§ 502, 503.

As noted in Part I, *supra*, the Court entered a Stipulated Permanent Injunction Against Defendant Compusource Distributors, Inc (Docket Entry # 44) on April 24, 2000.

In order to be awarded the statutory maximum of $1,000,000 per counterfeit trademark, the trademark owner bears the burden of proving, and the court must find, that the acts of infringement were committed willfully. *See* 15 U.S.C. § 1117(c)(2).

Under the Copyright Act, the present statutory minima and maxima are $200 and $100,000, respectively, for each copyright infringed. *See* 17 U.S.C. § 504(c)(2). "Statutory damages are designed not solely to compensate the copyright owner for losses incurred, but also to deter future infringement." *Johnson* 149 F.3d at 504 (quoting *F. W. Woolworth Co. v. Contemporary Arts, Inc.* 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed. 276 (1952)).

An intent to infringe can be shown by circumstantial evidence. *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1121 (6th Cir. 1996) (quotation marks and citations omitted). There does not appear to be any genuine issue of material fact that Compusource willfully infringed Microsoft's copyrights and trademarks, given its conduct after receiving Microsoft's cease and desist letter. (*See* Part IV.A, *supra.*)

Microsoft asserts that it would be entitled to recover statutory damages of up to $100,000 for each copyright willfully infringed and up to $1,000,000 for each trademark willfully infringed. However, Microsoft repeatedly contends in its brief in support of its motion and in its reply brief that it only seeks the maximum amount of statutory damages available for *non-willful* copyright infringement, and less than the full amount of available statutory trademark damages.

Considering Compusource's egregious conduct, the Court will award Microsoft statutory damages of $50,000.00 for each of its eight trademarks at issue and $15,000.00 for each of its nine copyrights at issue, for a total award of $535,000.00.

Microsoft also seeks costs in the amount of $866.00 and attorney fees in the amount of $16,337.00. Courts have routinely held that the award of full costs under the Copyright Act is mandatory.

*See Milene Music, Inc. v. Gotauco*, 551 F.Supp. 1288, 1297 (D.R.I.1982). In addition, in cases similar to the one at bar, courts have awarded attorney fees and costs against software distributors who have willfully infringed copyrights and trademarks. *See Grey Computer*, 910 F.Supp. at 1093; *Microsoft v. CMOS Tech. Inc.*, 872 F.Supp. 1329, 1341 (D.N.J.1994). Accordingly, the Court will award Microsoft attorney fees and costs. However, in so far as the only support for Microsoft's request is an attorney's affidavit which lacks any detail of the nature of the hours billed (Def.Ex. F), the Court will not at this time enter an award of fees and costs The Court requests from Microsoft an itemized list of charges with 14 days. Thereafter, Compusource may file a response with 14 days if it wishes to challenge any fees or costs.

## VII. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff Microsoft's Motion for Summary Judgment. The Court AWARDS Microsoft statutory damages of $50,000.00 for each of its eight registered trademarks which Defendant Compusource infringed, and $15,000.00 for each of its nine registered copyrights which Defendant Compusource infringed, for a total statutory damage award of $535,000.00. The Court GRANTS Plaintiff Microsoft's request for attorney fees and costs, but will take the amount of the award under advisement pending further submissions from the parties on the specific fees and costs.

SO ORDERED.