**MICROSOFT CORPORATION,**
**Plaintiff,**

v.

**SOFTWARE WHOLESALE CLUB,**
**INC. and Glenn Young,**
**Defendants.**

No. Civ.A. H–99–2310.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 15, 2000.

Elizann Carroll, Strasburger & Price, Dallas, TX, Kathleen O. Peterson, Preston Gates et al, Jane Barrett, Preston Gates et al, Los Angeles, CA, for Plaintiff.

Casey Jon Lambright, Houston, TX, for Defendant.

## MEMORANDUM AND ORDER

ROSENTHAL, District Judge.

Plaintiff, Microsoft Corporation ("Microsoft"), alleges that defendants Software Wholesale Club, Inc. ("SWC"), and SWC's owner, Glenn Young ("Young"), willfully distributed, offered for sale, and sold counterfeit copies of Microsoft's computer software programs and end user license agreements protected by Microsoft's copyrights and trademarks. (Docket Entry No. 1, Pl.'s Original Compl. ¶ 26). Defendants deny liability and have counterclaimed against Microsoft, alleging defamation. (Docket Entry No. 9, Defs.' Original Answer ¶ 8, and Docket Entry No. 14, Defs.' Original Counter Compl. ¶¶ 32–36). Pending before this court are defendants' motion for partial summary judgment dismissing Microsoft's claim for enhanced damages and attorney fees under the Copyright Act and Lanham Act, on the ground that the evidence fails to raise a fact issue as to willful infringement; and Microsoft's motion for summary judgment establishing defendants' liability for copyright and trademark infringement and dismissing defendants' counterclaim for defamation. For the purpose of its summary judgment motion, Microsoft has agreed to the limit of statutory damages available for non-willful copyright and trademark infringement.[1] (Docket Entry No. 31 at 16).

Based on the motions and responses, the pleadings, the parties' submissions, and the applicable law, this court DENIES defendants' motion and GRANTS Microsoft's motion, to the extent, and for the reasons, set forth below.

---

1. Microsoft has made clear its intent to seek enhanced statutory damages for willful infringement if this issue proceeds to trial. (Docket Entry No. 31 at 16, n. 3).

## I. BACKGROUND

### A. The Parties

#### 1. Microsoft

Microsoft is a corporation engaged in the business of developing, promoting, advertising, marketing, distributing, and licensing computer software programs. (Docket Entry No. 1, Pl.'s Original Compl. ¶ 11). The computer program at issue in this suit is the Microsoft Office 97 Professional Edition ("Office Pro 97"). (Id. ¶ 12). This program is a suite that combines several popular Microsoft programs into one kit, including Microsoft Access 97, Microsoft Excel 97, Microsoft Outlook 97, Microsoft Powerpoint 97, and Microsoft Word 97. (Id.). Microsoft distributes this software for sale to the public in a package with several components, including a jewelcase,[2] diskettes and/or CD–ROM, an accompanying end user license agreement ("EULA"), a user's instruction manual, a certificate of authenticity, a warranty card, and packaging materials. (Id. ¶ 13).

Customers interested in using multiple copies of the Office Pro 97 software need not purchase a large number of individual sets of the packaged software and materials. Instead, such customers have the alternative of purchasing the software with additional EULAs, distributed as Microsoft "License Paks." (Id. ¶ 14). License Paks grant users the right to operate authorized programs of Office Pro 97 on different computers without purchasing unnecessary CD–ROMs and documentation. (Id.). A business may purchase a single software package, which only authorizes a single user, and may purchase License Paks, which authorize the business to install and operate the software on a specified number of additional computers for a specified number of additional users. (Id.). Microsoft does not distribute EULAs separately from Microsoft software

---

2. A jewelcase is a plastic case that holds CD–ROM discs. (Docket Entry No. 28, Sellers Decl. ¶ 4).

products, except as License Paks. (*Id.* ¶ 17).

Microsoft has an extensive portfolio of works and marks protected under the Copyright Act and the Lanham Act. (*Id.* ¶¶ 19–25). Microsoft has copyrights in Microsoft Office Pro 97 (including the software and the EULA), Microsoft Access 97, Microsoft Excel 97, Microsoft Outlook 97, Microsoft Powerpoint 97, and Microsoft Word 97. (*Id.* ¶ 18–23). Microsoft's federally registered trademarks include (1) the word "Microsoft" for computer manuals, programs and services; (2) several logos—including the "Windows Flag Logo," the "Colored Windows Logo," and the "Puzzle Piece Logo"—for computer programs and peripherals; and (3) the terms "Powerpoint," "Microsoft Access," and "Bookshelf" for computer programs and/or manuals. (*Id.* ¶ 24).

*2. Defendants*

SWC is a Texas corporation in the business of selling computer software to dealers and retail distributors at discount prices. (Docket Entry No. 9, Defs.' Original Answer ¶¶ 3, 51). Glenn Young is the president and owner of SWC. (Docket Entry No. 31, Microsoft's Mot. For Summ.J. at 7, citing Young Dep. 14:14–15:4). Defendants' business primarily consists of purchasing low-cost software from businesses that are either overstocked, going out of business, or have "old" or damaged software. (Docket Entry No. 37, Defs.' Resp. to Pl.'s Mot. for Summ.J. at 5, citing Young September 2000 Aff.). SWC operates an Internet site from which it obtains most of its customers. (Docket Entry No.

31 at 2, citing Young Dep. 22:13–20). SWC also purchases "call lists" and visits trade shows to solicit sales. (*Id.*). Among its offerings, SWC purchases and sells Microsoft products, including the Office Pro 97 software. (Docket Entry No. 28, SWC's Business Records).

**B. Microsoft's Allegations in This Suit**

Microsoft alleges that on or about September 1, 1998, SWC publicly distributed a counterfeit copy of the Office Pro 97 software. (Docket Entry No. 1, Pl.'s Original Compl. ¶ 27). On learning of this distribution, Microsoft notified SWC of the alleged infringement by letter, insisting that SWC cease and desist such conduct. (*Id.* ¶¶ 27–28). On or about May 5, 1999, an investigator Microsoft hired purchased a EULA from SWC. Microsoft later determined that the EULA was counterfeit. (*Id.* ¶ 29). Microsoft asserts that defendants' conduct violates federal copyright and trademark laws as well as Texas state unfair competition laws. In addition to other remedies, Microsoft alleges a right to recover enhanced statutory damages and attorney fees based, in part, on the allegedly willful nature of defendants' conduct, as provided by the Copyright Act and the Lanham Act.[3] Microsoft seeks statutory damages for infringements of six copyrights and seven trademarks.[4]

Microsoft premises its allegation that the infringements were willful on several grounds. SWC's May 5, 1999 sale of a counterfeit EULA to an undercover investigator occurred after Microsoft's counsel had notified defendants of the prior sale of counterfeit Microsoft materials.[5] Accord-

---

**3.** *See* 17 U.S.C. § 504(c) (1994) and 15 U.S.C. § 1117(c) (1994), respectively.

**4.** Six copyrights and nine trademarks are at issue in this case. (Docket Entry No. 31 at 8, n. 8, 9, n. 9). However, the trademarks "Microsoft" and "Microsoft Access" are each registered under two classifications and Microsoft seeks recovery for each counterfeit mark, as provided in 15 U.S.C. § 1117(c) (1994). (*Id.* at 16, n. 14).

**5.** According to SWC, following receipt of the March 12, 1999 cease and desist letter, SWC's

counsel responded by telephone voice mail and by letter to Microsoft's counsel on March 26, 1999 and March 29, 1999 respectively. (Docket Entry No. 22, Defs.' Brief Supp. Partial Mot. Summ.J. ¶¶ 5–8). Microsoft's counsel claims to have returned the SWC voicemail message on or about April 2, 1999. (Docket Entry No. 28, Barrett Decl. ¶ 3). According to Microsoft, SWC never responded to the April 2, 1999 voice mail. (Docket Entry No. 28, Pl.'s Opp'n Defs.' Mot. Partial Summ.J. at 8, n. 4).

ing to Microsoft, defendants knowingly and intentionally infringed Microsoft's trademarks and copyrights on May 5, 1999. Defendants used Microsoft's website for guidance on avoiding counterfeited Microsoft products. On the website, Microsoft instructs that the best way to avoid dealing in counterfeit Microsoft products is to purchase only from authorized distributors. (Docket Entry No. 28, Sellers Decl. ¶ 13). Microsoft asserts that the evidence in this record shows that defendants purchased Microsoft products from a variety of distributors, only one of which was an authorized Microsoft distributor. Microsoft also alleges that defendants obtained and redistributed Microsoft products at prices so far below market as to be "highly suspect." (Docket Entry No. 28, Pl's Opp'n Defs.' Mot. Partial Summ.J. at 4). Microsoft asserts that in some cases, SWC obtained products at prices so low that SWC either had constructive knowledge that the products were counterfeit or was at least willfully blind to the likelihood that the products were counterfeit. (*Id.* at 3–4).

Microsoft also relies on the declaration of Tamara Sellers, a Microsoft employee who examined the software that SWC sold as Office Pro 97 on September 1, 1998. Sellers points to numerous variations between the appearance of what SWC sold and that of genuine Office Pro 97 software. The variations include: (1) nonoriginal colors on the Windows Flag Logo on the SWC jewelcase; (2) incorrect size and placement of the letter "g" in the term "designed for"; (3) incorrect coloring of the CD key label; (4) the absence of certain manufacturing codes from the CD-ROM discs; and (5) an improper image on the surface of the CD-ROM. (Docket Entry No. 28, Sellers Decl. ¶¶ 3–5). Microsoft asserts that these variations clearly indicated that what SWC sold as a Microsoft product was obviously not genuine.

Defendants respond that SWC routinely verifies that the products it offers for sale are legitimate using the methods that Microsoft's website and "anti-piracy" hotline prescribe. (Docket Entry No. 37, Young

September Aff.). Defendants assert that Microsoft's website and "anti-piracy" hotline do not list the indicators of a counterfeit product Sellers cited. (Docket Entry No. 22, Defs.' Br.Supp. Partial Summ. J ¶¶ 11–12). Defendants argue that, even assuming the products to be counterfeit, defendants had no reason to know that fact.

## II. THE APPLICABLE LEGAL STANDARDS

### A. The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56. Whether a fact is "material" turns on the substantive law governing the claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over a material fact is genuine only if the evidence in the summary judgment record suffices for a reasonable fact-finder to return a verdict in favor of the nonmoving party. *See id.* In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. The inquiry at the summary judgment stage of litigation is whether the evidence disclosed in the summary judgment record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the ab-

sence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *See id.* at 1075. If, however, the moving party meets the initial burden, then the nonmoving party must point to evidence in the summary judgment record sufficient for a reasonable fact finder to decide in her favor. A scintilla of evidence, conclusory allegations, speculations, and unsubstantiated assertions will not carry this burden. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *see also Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (en banc); *Little*, 37 F.3d at 1075.

In effect, the summary judgment procedure permits a party who doubts the existence of a genuine issue as to an essential fact of the opposing party's case to "demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). An affidavit filed in opposition to a properly-supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." FED. R.CIV.P. 56(e). Such an affidavit must establish a proper evidentiary foundation for the facts stated within it—in other words, the affidavit must (1) show affirmatively that the affiant is competent to testify; (2) be based on the personal knowledge of the affiant; and (3) establish facts that would be admissible at trial. *See id.; see also Williams v. Trader Publishing Co.*, 218 F.3d 481, 485 (5th Cir.2000) ("Evidence may only be introduced at the summary judgment phase of a trial if the evidence would be admissible at trial.").

"When a district court denies a motion for summary judgment on the basis that there exist genuine issues of material fact, the district court is actually making two separate conclusions: 'First, the court has concluded that the issues of fact in question are genuine, i.e., the evidence is sufficient to permit a reasonable factfinder to return a verdict for the nonmoving party. Second, the court has concluded that the issues of fact are material, i.e. resolution of the issues might affect the outcome of the suit under governing law.'" *Lemoine v. New Horizons Ranch & Ctr., Inc.*, 174 F.3d 629, 633 (5th Cir.1999) (quoting *Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir.), *cert. denied*, 525 U.S. 1054, 119 S.Ct. 618, 142 L.Ed.2d 557 (1998)).

## B. The Copyright Act Standard

The Copyright Act protects original works of authorship fixed in a tangible medium of expression. *See* 17 U.S.C. § 102 (1994). Although copyright does not extend to ideas, procedures, processes, systems, or methods of operation, it is well established that the protection encompasses software. *See Computer Management Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 400 (5th Cir.2000) (recognizing that the Copyright Act was amended in 1976 to include computer programs in the definition of protectable literary works).

■■■ A copyright owner possesses the exclusive right to do and to authorize six activities: (1) the reproduction of the copyrighted work; (2) the preparation of derivative works based upon the copyrighted work; (3) the public distribution of the copyrighted work; (4) in the case of certain works, the public performance of the copyrighted work; (5) in the case of certain works, the public display of the copyrighted work; and (6) in the case of sound recordings, the public performance of the copyrighted work by means of a digital audio transmission. *See* 35 U.S.C. § 106 (1994). To establish copyright infringement, a plaintiff must prove both ownership in the copyrights at issue and encroachment by the defendant upon one of these six exclusive rights. *See* 17 U.S.C. § 501 (1994); *see also Avtec Systems, Inc.*

*v. Peiffer*, 21 F.3d 568, 571 (4th Cir.1994). Neither lack of knowledge nor intent is a defense to a claim of copyright infringement. *See Fitzgerald Publishing Co. v. Baylor Publishing Co., Inc.*, 807 F.2d 1110, 1113 (2d Cir.1986).

 One limitation on the copyright holder's exclusive public distribution right under section 106(3) of the Copyright Act is the "first-sale doctrine." The first-sale doctrine is codified by the Copyright Act:

> Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord. . . .

17 U.S.C. § 109(a) (1994). The Fifth Circuit has noted that "[e]ven if the copyright holder places restrictions on the purchaser in a first sale (such as specifying the permissible uses of the article), the buyer's disregard of the restrictions on resale does not make the buyer or the person who buys in the secondary market liable for infringement. . . . The first sale thus extinguishes the copyright holder's ability to control the course of copies placed in the stream of commerce." *American Int'l Pictures v. Foreman*, 576 F.2d 661, 664 (5th Cir.1978) (citation omitted). The court recognized a significant limitation on the doctrine: "[E]ven an unwitting purchaser who buys a copy in the secondary market can be held liable for infringement if the copy was not the subject of a first sale by the copyright holder. Thus unless title to the copy passes through a first sale by the copyright holder, subsequent sales do not confer good title." *Id.* If the copyright owner licenses, rather than sells, the copyrighted work, the first-sale doctrine may not apply. *See Microsoft v. Harmony Computers & Elecs., Inc.*, 846 F.Supp. 208, 212–14 (E.D.N.Y.1994). Alleged infringers bear the burden of tracing the chain of title to prove the applicability of the first-sale doctrine. *Id.*

Under section 504 of the Copyright Act, the plaintiff may elect to recover either its actual damages and defendant's profits, or to recover statutory damages, which ordinarily range from $500 to $20,000 per copyrighted work. *See* 17 U.S.C. § 504(c) (1994). If the copyright owner elects statutory damages and succeeds in proving willful infringement, the court may increase the damage award to as much as $100,000 per copyrighted work: "In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $100,000." *Id.*

 A defendant's infringement is willful under section 504 if he "knows his actions constitute an infringement." *Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir.1988). Actual knowledge is not required; constructive knowledge of infringement satisfies the willfulness standard. *See Fitzgerald Publishing*, 807 F.2d at 1115. Evidence that the defendant received notice before the infringement occurred has been deemed "persuasive evidence of willfulness." *Swallow Turn Music v. Wilson*, 831 F.Supp. 575, 579 (E.D.Tex.1993). Although lack of actual knowledge and intent do not shield a defendant against copyright infringement liability, proof of a culpable mental state may become a plaintiff's sword in the damages phase of a copyright infringement suit.

 The Copyright Act also authorizes the trial court to award attorney fees to the prevailing party. *See* 17 U.S.C. § 505 (1994) ("In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party . . . [and] may also award a reasonable attorney's fee to the prevailing party as part of the costs."). In *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), the United States Supreme Court rejected the "British Rule" that mandates an award of attorney fees and explained

that such fees "are to be awarded ... only as a matter of the court's discretion." Following *Fogerty*, the Fifth Circuit has reaffirmed its position that such awards are "discretionary but routinely awarded." *Hogan Sys., Inc. v. Cybresource Int'l, Inc.*, 158 F.3d 319, 325 (5th Cir.1998). A finding of willful infringement is not a prerequisite to an award of attorney fees under the Copyright Act.

### C. The Trademark Infringement Standard

■ Trademarks and service marks consist of "any word, name, symbol, or device, or any combination thereof" utilized to identify and indicate the source of one's goods and services, respectively. 15 U.S.C. § 1127 (1999); *see also Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir.1998). The Lanham Act, which encompasses federal trademark and unfair competition law, protects both mark owners and consumers by providing mark owners a cause of action against others who subsequently adopt the same—or a confusingly similar—mark. *See* 15 U.S.C. §§ 1114(1) & 1125(a) (1994) (referred to as Section 32(1) and Section 43(a), respectively).[6] In order to prevail on a trademark infringement claim under the Lanham Act,

a plaintiff must prove that it possesses rights in the mark and that the defendant's mark is likely to cause consumer confusion. *See Pebble Beach*, 155 F.3d at 536–37. "A cause of action for the infringement of a registered mark in violation of [section 32(1) ] exists where a person uses (1) any reproduction, counterfeit, copy or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution or advertising of any goods; (5) where such use is likely to cause confusion, or to cause mistake or to deceive." *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg.*, 510 F.2d 1004, 1009–10 (5th Cir. 1975); *see also Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F.Supp. 1513, 1536 (S.D.Tex.1996).

■ A mark can be registered only if it is capable of distinguishing the applicant's goods from those of others. The more distinctive the mark, the greater its ability to serve as an indicator of source. *See Sugar Busters LLC v. Brennan*, 177 F.3d 258, 267–68 (5th Cir.1999). Marks are often classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *See id.* at 268.

6. Section 32(1) of the Lanham Act provides:

Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1) (1994). Section 43(a) of the Lanham Act provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (1994).

Suggestive, arbitrary, and fanciful marks are defined as inherently distinctive and entitle the mark owner to immediate protection. *See Igloo Prods. Corp. v. Brantex, Inc.*, 202 F.3d 814, 817 (5th Cir.2000). In contrast, generic marks refer to the "genus of which the particular product is a species" and are neither registerable as trademarks nor protectable under Section 43(a). *Sugar Busters*, 177 F.3d at 268. Descriptive marks describe a characteristic or quality of the product or service and are only protected when they acquire secondary meaning. *See id.* at 268. Secondary meaning exists when "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 766 & n. 4, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

 Once the plaintiff's trademark is deemed protectable, liability for infringement "hinges upon whether a likelihood of confusion exists in the minds of potential consumers as to the source, affiliation, or sponsorship of the defendant's product or service due to the use of the allegedly infringing marks...." *Id.* at 537. The Fifth Circuit treats likelihood of confusion as a question of fact, subject to the clearly erroneous standard of review. *See Marathon Mfg. Co. v. Enerlite Products Corp.*, 767 F.2d 214, 217 (5th Cir.1985). Likelihood of confusion refers not only to confusion as to the source of goods or services, but also to confusion as to sponsorship or affiliation. *See Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663 (5th Cir.2000).

 A determination of likelihood of confusion turns on the analysis of seven factors: (1) the type of mark; (2) the similarity of the two marks; (3) the similarity of the goods or services; (4) the identity of customers and similarity of retail outlets; (5) the similarity of advertising; (6) the intent of the alleged infringer; and (7) evidence of actual confusion, if any exists. *See Pebble Beach*, 155 F.3d at 543. "No single factor is dispositive, and a find-ing of a likelihood of confusion does not require a positive finding on a majority of these 'digits of confusion.'" *Id.* at 543. A court is free to consider other relevant factors in assessing likelihood of confusion. *See Westchester Media*, 214 F.3d at 664.

Section 35 of the Lanham Act allows a successful plaintiff to recover an infringer's profits, as well as damages, costs, and attorney fees. *See* 15 U.S.C. § 1117 (1994). The federal appellate courts that have addressed the issue uniformly apply the section 35 remedies to violations of sections 32 and 43(a). *See Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1126 (5th Cir.1991), *aff'd*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). "The purpose of [section 35] is to take all the economic incentive out of trademark infringement." *Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816, 824 (5th Cir.1998), *cert. denied*, 526 U.S. 1133, 119 S.Ct. 1808, 143 L.Ed.2d 1011 (1999) (quoting *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir.1993)).

The Lanham Act, like the Copyright Act, provides for statutory damages under certain circumstances. *See* 15 U.S.C. § 1117(c) (1994). Section 1117(c) provides:

> In a case involving the use of a counterfeit mark (as defined in section 1116(d) of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of (1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or (2) if the court finds that the use of the counterfeit mark was willful, not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

*Id.* The maximum statutory damage award for nonwillful infringement using a counterfeit mark is $100,000 per mark. The maximum statutory damage award for willful infringement using a counterfeit mark increases to $1,000,000 per counterfeit mark. *Id.*

 Section 35(a) authorizes an award of attorney fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a); *see also Pebble Beach,* 155 F.3d at 554. An exceptional case is one in which the "violative acts can be characterized as malicious, fraudulent, deliberate, or willful." *Pebble Beach,* 155 F.3d at 555. The exceptional nature of the case must be proved by clear and convincing evidence. *Id.* The Fifth Circuit has explained that an award of attorney fees under section 35(a) requires a showing of a "high degree of culpability" and is normally inappropriate when the "party presents what it in good faith believes may be a legitimate defense." *Id.* at 556 (quoting *Texas Pig Stands, Inc. v. Hard Rock Cafe, Int'l, Inc.,* 951 F.2d 684, 697 (5th Cir.1992) and *CJC Holdings, Inc. v. Wright & Lato, Inc.,* 979 F.2d 60, 66 (5th Cir.1992)).

Although section 35(a) limits the award of attorney fees to exceptional cases, the standard is somewhat different when the alleged infringement involves a counterfeit mark. Section 35(b) provides:

> In assessing damages under [section 35(a) ], the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 1114(1)(a) of this title ... that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark ..., in connection with

the sale, offering for sale, or distribution of goods or services.

15 U.S.C. § 1117(b) (1994). If counterfeit marks are involved, section 35(b) provides that the court "shall" award the prevailing plaintiff treble damages and attorney fees if the defendant intentionally used the mark and knew that the mark was counterfeit, unless "extenuating circumstances" exist. *Id.; see also Rolex Watch,* 158 F.3d at 824 ("[F]or counterfeit cases, under subsection (b), the court shall award treble profits and attorney's fees, unless the court finds extenuating circumstances.") (internal quotation marks omitted).

Both the standard for enhanced willful infringement damages and attorney fees under the Lanham Act require some form of "willful, deliberate, or fraudulent conduct." However, the *Taco Cabana* court declined to "conflate the standards," recognizing that some cases might warrant either an enhanced damages or attorney fees award, but not both. *Taco Cabana,* 932 F.2d at 1127. Under both subsections of section 35, "awards are never automatic and may be limited by equitable considerations." *Rolex Watch,* 158 F.3d at 826.

## III. ANALYSIS OF MICROSOFT'S CLAIMS

### A. Liability for Copyright and Trademark Infringement

#### 1. Copyright Infringement

 Microsoft has moved for summary judgment that defendants infringed six of Microsoft's copyrights through the September 1, 1998 sale of counterfeit Office Pro 97 software to Rosey Sun. Microsoft's initial burden is to show ownership in its copyrights and a violation of one of its exclusive rights by defendants. Microsoft has six relevant federally registered copyrights in the Office Pro 97 software.[7] Fed-

---

7. Microsoft's registered copyrights include (1) "Microsoft Office 97 (Professional Edition)" (Copyright Registration No. TX 4–395–984); (2) "Microsoft Access 97" (Copyright Registration No. TX 4–395–639); (3) "Microsoft Excel 97" (Copyright Registration No. TX 4–395–640); (4) "Microsoft Outlook 97" (Copy-

right Registration No. TX 4–395–686); (5) "Microsoft Powerpoint 97" (Copyright Registration No. TX 4–395–685); and (6) "Microsoft Word 97" (Copyright Registration No. TX 4–395–687). (Docket Entry No. 28, Sellers Decl. ¶ 11).

eral registration constitutes *prima facie* evidence of the validity of the copyrights. *See Norma Ribbon & Trimming, Inc. v. Little,* 51 F.3d 45, 47 (5th Cir.1995). Defendants have not disputed the validity of Microsoft's copyrights in those programs. Nor have defendants disputed that on or about September 1, 1998, they distributed to Rosey Sun components purporting to be Office Pro 97 software, which later analysis revealed to be counterfeit. (Docket Entry No. 28, Sun Decl.; Sellers Decl., ¶¶ 3–5).

■ The burden shifts to defendants to submit evidence raising a fact issue as to either the claim that Microsoft owns copyrights in the Office Pro 97 software or that defendants violated Microsoft's 17 U.S.C. § 106(3) public distribution right.[8] Defendants have provided no such evidence. Defendants' assertion of their lack of knowledge of the counterfeit nature of the software sold is irrelevant to their liability under the Copyright Act. *See Fitzgerald Publishing Co.,* 807 F.2d at 1113. This court GRANTS Microsoft's motion for summary judgment on its claims that defendants infringed Microsoft's copyrights in the Office Pro 97 software.

### 2. Trademark Infringement

■ Microsoft also seeks summary judgment as to trademark infringement under the Lanham Act. Microsoft must show evidence of ownership in the marks coupled with a use in commerce by defendants that is unauthorized and is likely to cause confusion. Microsoft owns nine federally registered trademarks relevant to this litigation and sells goods under these trademarks in interstate commerce.[9] (Docket Entry No. 31, Sellers Decl. ¶ 12). Microsoft has established that the defendants sold purported Office Pro 97 software components over the Internet. SWC's business records show that SWC engaged in both intrastate and interstate commerce. (Docket Entry No. 31, SWC's Business Records). In addition to Rosey Sun's summary judgment evidence as to defendants' sale of a counterfeit Office Pro 97 software package, Microsoft submitted undisputed evidence that defendants later sold a counterfeit EULA bearing the "Microsoft" trademark. (Docket Entry No. 31, Lawson Decl.; Sellers Decl., ¶¶ 6–8). Defendants have used the Microsoft marks without authorization and in commerce.[10]

8. Defendants argue that the first-sale doctrine protects purchases from both authorized and unauthorized distributors. (Docket Entry No. 37, Defs.' Supplemental Mot. for Summ.J. and Resp. to Pl.'s Mot. and Rebuttal at 4). This argument will be discussed at length in the willfulness analysis. However, in analyzing whether copyright infringement has occurred, the first-sale doctrine does not apply to an admittedly counterfeit unit. *See Novell, Inc. v. CPU Distributing, Inc.,* CV H–97–2326, 2000 U.S.Dist. LEXIS 9975, at *10, n. 5 (S.D.Tex. May 4, 2000).

9. Microsoft's relevant registered trademarks include the marks (1) "Microsoft" (Trademark and Service Mark Registration No. 1,200,236) for computer programs and programming services; (2) the Windows Flag Logo (Trademark Registration No. 1,816,354) for computers, computer peripherals, and computer programs and manuals sold as a unit; (3) the colored Windows Flag Logo (Trademark Registration No. 1,815,350) for computers, computer peripherals, and com-

puter programs and manuals sold as a unit; (4) the Puzzle Piece Logo (Trademark Registration No. 1,982,562) for computer programs and instruction manuals sold as a unit; (5) "Powerpoint" (Trademark Registration No. 1,475,795) for computer programs; (6) "Microsoft Access" (Trademark Registration No. 1,741,086) for computer programs for use with databases; and (7) "Bookshelf" (Trademark Registration No. 1,592,783) for computers, computer programs and manuals. (Docket Entry No. 28, Sellers Decl. ¶ 10).

10. Section 45 of the Lanham Act defines "commerce" as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127 (1994). Although in this case defendants were engaged in interstate commerce, their intrastate business alone would have satisfied the "commerce" requirement of the Lanham Act. *See Purolator, Inc. v. EFRA Distribs., Inc.,* 687 F.2d 554, 559 (1st Cir. 1982) ("It is well established that jurisdiction exists to grant relief under the Lanham Act if a defendant's activities although wholly intra-

Counterfeit Microsoft marks are likely to cause consumer confusion.[11] There is also proof of actual confusion on the part of Rosey Sun, who purchased what purported to be Office Pro 97 software from SWC.[12]

Microsoft has established that defendants routinely acquired purported Office Pro 97 software components from unauthorized distributors. Microsoft analyzed the software and the EULA in question and found them to be counterfeit. Defendants have proffered no evidence that Microsoft authorized use of counterfeit marks. Defendants have failed to offer any evidence controverting the proof of trademark infringement.

This court GRANTS Microsoft's motion for summary judgment on its seven claims of trademark infringement under the Lanham Act.

### B. The First–Sale Doctrine

Defendants argue that because the first-sale doctrine limits a copyright holder's ability to control subsequent transfers, Microsoft cannot legitimately control purchases and sales of Microsoft products on the secondary market. Defendants cite *Novell, Inc. v. CPU Distrib., Inc.*, CV H–97–2326, 2000 U.S.Dist. LEXIS 9975 (S.D.Tex. May 4, 2000) to support defendants' argument that "the first sale doctrine protects purchase from both autho-

rized and unauthorized distributors or any other seller in the secondary market." (Docket Entry No. 37, Defs.' Supplemental Mot. for Summ.J. and Resp. to Pl.'s Mot. and Rebuttal at 4).

■ Under the first-sale doctrine, the exclusive statutory right to distribute copyrighted works applies only to the first sale of the work in question. *See* 17 U.S.C. § 109(a) (1994); *see also Bobbs–Merrill v. Straus*, 210 U.S. 339, 350–51, 28 S.Ct. 722, 52 L.Ed. 1086 (1908). However, a party that licenses its products rather than selling them may avoid the application of the first-sale doctrine. *See, e.g., Harmony Computers & Elecs.*, 846 F.Supp. at 212–14 (the fact that Microsoft licenses rather than sells its products likely precludes application of the first-sale doctrine); *Novell, Inc.*, 2000 U.S.Dist. LEXIS 9975, at *7–18 (the first-sale defense applied, but only because Novell sold, rather than licensed, its software product).

■ Defendants assert that Microsoft sells—and in some cases gives away—its software products. Defendants claim that Microsoft has "sold thousands of copies of software without requiring licensing thereof or requiring the purchaser to have valid licenses for the software distributed," and "distributes software and related peripher-

state tend to have a damaging effect on plaintiff's federally protected interstate business.") (internal quotations omitted); *Microsoft Corp. v. Grey Computer*, 910 F.Supp. 1077, 1087 (D.Md.1995) ("Where, as here, Plaintiff is a large corporation conducting business in numerous states, and worldwide, a presumption arises that the Defendants' intrastate activities have a substantial effect on interstate commerce."); *Minute Man of Am., Inc., v. Coastal Restaurants, Inc.*, 391 F.Supp. 197, 200 (N.D.Tex.1975) ("Plaintiff is a multi-state corporation doing business in six states." Obviously, an infringement on the Plaintiff's federal trademark would have a significant impact on interstate commerce.).

11. Generally, a likelihood of confusion analysis involves a factual inquiry into several different factors. *See Pebble Beach*, 155 F.3d at 543. However, in the case of a counterfeit mark, likelihood of confusion is clear. *See Grey Computer*, 910 F.Supp. at 1088 ("Where,

as here, the goods distributed by Defendants are intentional copies and virtually identical to the trademark owner's goods, likelihood of confusion may be established at the summary judgment stage."); *Microsoft Corp. v. CMOS Technologies, Inc.*, 872 F.Supp. 1329, 1335 (D.N.J.1994) ("It would be difficult to imagine a clearer case of consumer confusion than the instant case in which the defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety. Under these circumstances, the likelihood of consumer confusion, mistake, or deception is clear.").

12. *Cf. Shakespeare Co. v. Silstar Corp. of Am.*, 110 F.3d 234, 241 (4th Cir.1997) (recognizing that "where ... one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion").

als directly to certain computer manufacturers, including giving away software without corresponding licenses." (Docket Entry No. 14, Defs.' Original Counter Compl. ¶¶ 5–6). Defendants point out that Microsoft has no evidence that any of their distributors has infringed Microsoft's intellectual property rights. (Docket Entry No. 37, Defs.' Resp. to Pl.'s Mot. for Summ.J. at 5, citing Sellers Dep. 150:8–159:17). However, the summary judgment record does not reflect any evidence, other than defendants' unsupported allegations, that Microsoft sells, rather than licenses, its software. Defendants have not met their burden of tracing the chain of title to show a basis for the first-sale doctrine. *See Harmony Computers & Elecs.*, 846 F.Supp. at 213.

### C. Microsoft's Statutory Damages and Attorney Fees Under the Copyright Act and Lanham Act

*1. Damages*

Microsoft and defendants cross-move for summary judgment on statutory damages and attorney fees. Microsoft has agreed to limit its statutory damages on summary judgment to those non-enhanced damages available for nonwillful infringement, $20,000.00 for each copyright infringement and $100,000.00 for each trademark infringement, as well as attorney fees. Although Microsoft is willing to accept damages that do not require a finding of willful infringement, it is seeking the maximum amount of those damages. The factors relevant to the size of statutory damages under section 504(c) of the Copyright Act are also appropriate to measuring damages under section 1117(c) of the Lanham Act. *See Sara Lee Corp. v. Bags of N.Y., Inc.*, 36 F.Supp.2d 161, 166 (S.D.N.Y.1999). The summary judgment evidence as to defendants' notice of the counterfeit nature of the products is relevant to the amount of statutory damages to be awarded.

SWC's own business records show that defendants distributed purported Microsoft software and software components at widely varying prices. Defendants' often purchased questionable Microsoft Office Pro 97 products at prices much below the prices charged for presumably genuine Microsoft Office Pro 97 products. (Docket Entry No. 28, SWC's Business Records). For example, Microsoft points to SWC's purchases of product labeled as Office Pro 97 software for less than $50 per unit in December of 1998, in contrast to SWC's sales of the presumably legitimate Office Pro 97 software for as much as $385 in May of 1999. Courts have held that suspiciously low prices may provide a basis for finding constructive knowledge that merchandise was counterfeit. *See Screen Gems–Columbia Music, Inc. v. Mark–Fi Records, Inc.*, 256 F.Supp. 399, 404 (S.D.N.Y.1966) (a suspiciously low price allows an inference of constructive knowledge of the illegitimacy of the product); *Filipowski v. Rogovin*, 2000 WL 983727, *3 (N.D.Ill.2000) ("It is a reasonable inference that defendants paid so little because they actually knew or believed they were purchasing stolen property."). Microsoft asserts that SWC's sale of counterfeit Microsoft products at such low prices shows SWC either had constructive knowledge that the products were counterfeit or was at least willfully blind to the likelihood that the products were counterfeit.

Microsoft also points to other evidence of willfulness or willful blindness. Defendants acquired purported Microsoft Office Pro 97 clearly marked "NFR"—not for retail sale—for the purpose of selling it at retail. (Docket Entry No. 31 at 5–6, citing Young Dep. 102:6–19). Defendants sold Windows 95 Manuals with what purported to be a Certificate of Authenticity ("COA"), but without accompanying software. (*Id.* at 4–5, citing Young Dep. at 29:20–30:4). Because the only purpose of a COA is to authenticate software, there is no legitimate reason to distribute a COA separately from software. *See Microsoft Corp. v. Compusource Distributors, Inc.*, 115 F.Supp.2d 800, 803 n. 6 (E.D.Mich. 2000). Defendants acquired and distributed what purported to be Office Pro 97

"zipper packs," containing a license and a COA but no software. (Docket Entry No. 31 at 5, citing Young Dep. at 96:6–13). Defendants also purchased and distributed what purported to be jewelcases for Office Pro 97, but without software. (*Id.*, citing Young Dep. at 95:24–96:5). Defendants combined licenses from one source with software from another and sold the units at prices substantially above what SWC paid for the separate components.[13] (*Id.*, citing Young Dep. at 143:11–144:4; 148:13–24). Microsoft argues that defendants mixed and matched separately acquired components, that are sold together if genuine, to put together a seemingly genuine product package. Defendants also advertised and distributed Microsoft "OEM" software on a "stand alone" basis, notwithstanding defendants' knowledge that Microsoft authorizes such products for distribution only when they are installed on, and sold with, a new computer. (*Id.*, citing Young Dep. at 31:11–32:25).

Microsoft also points to summary judgment evidence showing that even after Microsoft notified defendants of their infringing activity, they continued to deal in counterfeit products. Microsoft's attorneys notified defendants by letter dated March 12, 1999 of the infringing sale to Rosey Sun, insisted that defendants cease and desist their infringing conduct, and directed defendants to Microsoft's anti-piracy website. (Docket Entry No. 28, Stein Decl.).[14] Microsoft's anti-piracy website contains a list of authorized distributors and advises that the best way to avoid obtaining counterfeit Microsoft software is to obtain it only from authorized

suppliers. (Docket Entry No. 28, Microsoft's Resp. to Defs.' Mot. for Summ.J. at 4, citing Sellers Decl. ¶ 13). Microsoft claims that defendants continued to purchase the lion's share of their purportedly Microsoft products from unauthorized distributors. (Docket Entry No. 31, Microsoft's Mot. for Summ.J. at 6, citing SWC's Business Records). Glenn Young admitted that purchasing Microsoft products from authorized Microsoft distributors was "not an important issue" for defendants. (Docket Entry No. 31, Microsoft's Mot. for Summ.J. at 5, citing Young Dep. 70:6–13).

Defendants respond that after the notification of the initial infringement, SWC made a good faith effort to address the problem by asking Microsoft the best way to determine if a component was a genuine Microsoft product. (Docket Entry No. 22, Defs.' Mot. for Summ.J. ¶ 6, citing Pl.'s Resp. to Young's Request for Admissions, Answers 1, 2, 3 and 5). Defendants claim to have regularly consulted Microsoft's 1–800–RU–LEGIT helpline. Defendants assert that none of the allegedly infringing material SWC sold was missing the earmarks of authenticity identified on Microsoft's website or its 1–800–RU–LEGIT helpline. Microsoft's website and its 1–800–RU–LEGIT helpline did not list the six indicia of counterfeit status identified by Microsoft in this case. (Docket Entry No. 22, Defs.' Mot. for Summ.J. ¶¶ 9,13–14, citing Pl.'s Resp. to Young's First Set of Interrogatories, Answer 3).

Defendants insist that SWC routinely examined software for those indicia of counterfeit merchandise specifically listed on the Microsoft website and anti-piracy

---

13. SWC's business records suggest that SWC purchased Office Pro 97 software and Office Pro 97 licenses separately for $40 and $30, respectively. (Docket Entry No. 31, SWC's Business Records). SWC then combined Office Pro 97 software and licenses, which were sold as a unit for between $120 and $150. (*Id.*). SWC sold such a combination to Don Lawson for $140. (Docket Entry No. 31, Lawson Decl.).

14. Defendants' counsel left a message for Microsoft's counsel on March 26, 1999. The parties disagree as to whether Microsoft's counsel ever responded to the March 26, 1999 call. According to Microsoft, Microsoft's counsel returned defendants' March 26, 1999 call on April 2, 1999 and received no further contact from defendants' counsel. (Docket Entry No. 28, Jane Barrett Decl.). According to defendants, Microsoft never returned defendants' March 26, 1999 call. (Docket Entry No. 22 ¶ 8). This dispute is not material to the issues on summary judgment.

hotline. (Docket Entry No. 23, Young June Aff.). Defendants claim to have discovered, and refused to accept, infringing software in the past. (Docket Entry No. 37, Defs.' Resp. to Pl.'s Mot. for Summ.J. at 8, citing Young September Aff.). Because Microsoft did not list the deviations found on the allegedly counterfeit software or EULA, defendants argue that any infringement they committed was innocent.

The summary judgment record does not support defendants' argument. The record reveals that one of SWC's own customers, Rosey Sun, found that the product she purchased from SWC appeared so suspicious that she contacted Microsoft. Microsoft's website and helpline do not purport to provide an exhaustive list of characteristics of a counterfeit product. Defendants assert a right to ignore other indications that the products they deal in are counterfeit, which is not the law. A finding of willfulness does not require actual knowledge, but rather willful blindness. *See Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.,* 955 F.2d 1143, 1148 (7th Cir.1992) (recognizing that "willful blindness" is equivalent to actual knowledge under the Lanham Act).

Defendants also dispute Microsoft's assertion that low or widely varying prices permit an inference of knowledge that products are not genuine. Defendants contend that SWC's business consists primarily of purchasing low-cost software from businesses that are either overstocked, going out of business, or have "old" or damaged software. (Docket Entry No. 37, Defs.' Resp. to Pl.'s Mot. for Summ.J. at 5, citing Young September Aff.). Defendants point out that Tamara

Sellers, Microsoft's designated expert, admitted that there might be legitimate reasons—such as the age of the software or the damaged nature of the packaging—for selling software at less than its original suggested retail price. (Docket Entry No. 37, Defs.' Resp. to Pl.'s Mot. for Summ.J. at 6, citing Sellers Dep. 136:11–17, 138:5–25, 139:1–22).[15]

However, the summary judgment record contradicts defendants' argument that the low prices for the products sold reflected old, overstocked, or damaged merchandise. It is undisputed that Office Pro 97 was a current and popular, rather than an old or overstocked, software title during the time of the infringing sales. Defendants' own sales records show substantial purchases and sales of Office Pro 97 software, inconsistent with overstock. (Docket Entry No. 28, SWC's Business Records). There is no evidence that the products purchased and sold were damaged in any way. Price alone is not conclusive of a lack of genuineness, but does have significant probative value.

Microsoft has submitted significant, undisputed summary judgment evidence that supports an award of ordinary statutory damages toward the upper end of the applicable range, which does not require a specific finding of willfulness. Other factors relevant to the size of statutory damages support this result. One factor under the Copyright Act is the profits of the infringers. *See Fitzgerald Publishing,* 807 F.2d at 1117. SWC grossed $2,440,666 and $1,675,116 in 1997 and 1998, respectively. (Docket Entry No. 31 at 6, citing Young Dep. 47:24–48:2 & 44:24–45:1). Even assuming that SWC only netted a 20 percent profit on sales,[16] this corresponds

---

**15.** Tamara Sellers admitted that "[definitely I think there are other factors which is why pricing alone wouldn't necessarily indicate a counterfeit or genuine title.]" (Docket Entry No. 37, Defs.' Resp. to Pl.'s Mot. for Summ.J. at 6, citing Sellers Dep. 140:9–11).

**16.** Glenn Young stated in his deposition that SWC targets a 20 percent markup but often receives much less. (Docket Entry No. 31, Microsoft's Mot. for Summ.J. at 6, citing

Young Dep. 54:10–13). However, SWC's Business Records show that SWC purchased Office Pro 97 software and Office Pro 97 licenses separately for $40 and $30, respectively. (Docket Entry No. 31, SWC's Business Records). SWC then combined Office Pro 97 software and licenses, which were sold as a unit for between $120 and $150. (*Id.*). SWC sold such a combination to Don Lawson for $140, a price far above a 20 percent markup. (Docket Entry No. 31, Lawson Decl.).

to profits of $823,156.40 over the two years. According to Glenn Young, approximately 50 percent of SWC's sales are Microsoft products. (Docket Entry No. 31 at 6, citing Young Dep. 53:12–20). *See Fitzgerald Publishing,* 807 F.2d at 1117. Finally, the deterrent effect of the award on a defendant and on others figures into the statutory damages calculus. *See id.* Microsoft has presented sufficient competent, undisputed, factual evidence to justify an award of statutory damages toward the upper end of the range for non-willful infringement.[17]

Based on the record, this court ORDERS defendants to pay Microsoft $15,000.00 for each of the six separate copyright infringements and $50,000.00 for each of the seven separate trademark infringements, for a total award of $440,000.00.

### 2. Attorney Fees

■ As Microsoft correctly observes, an award of attorney fees to a plaintiff under the Copyright Act does not require a finding of defendants' culpable mental state. An award of attorney fees for copyright infringement is "discretionary but routinely awarded." *Hogan Systems, Inc. v. Cybresource Int'l, Inc.,* 158 F.3d 319, 325 (5th Cir.1998). Microsoft has met the requirements for an award of its reasonable and necessary attorney fees under the Copyright Act.

Attorney fees for cases involving trademark infringement are appropriate in "exceptional" cases. 15 U.S.C. § 1117(a); *see also Pebble Beach,* 155 F.3d at 554. Even for suits involving counterfeit marks, an award of attorney fees is premised on the defendant's "knowing" conduct. 15 U.S.C.

§ 1117(b) (1994). This court has awarded statutory damages in the non-willful range and does not award attorney fees for the trademark claims under the Lanham Act. In cases in which attorney fees are awarded as to some claims and denied as to others, an apportionment of attorney fees is proper. *See Gracie v. Gracie,* 217 F.3d 1060, 1069–1070 (9th Cir.2000) (requiring the district court to apportion fees between Lanham Act claims and non-Lanham Act claims unless the claims "are so intertwined that it is impossible to differentiate" between them); *Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1383 (requiring the district court to apportion attorney fees between copyright and trademark claims when an award of attorney fees is appropriate under the Copyright Act but not under the Lanham Act).

### D. Defendant's Counterclaim

Defendants' original counter-complaint alleged slanderous and libelous statements by Microsoft. °(Docket Entry No. 14, Defs.' Original Counter Complaint 23–26). Defendants have produced evidence of an announcement on Microsoft's website, which announced that Microsoft had filed suit against several companies for allegedly distributing counterfeit software licenses and, in some cases, software. (Docket Entry No. 31, Pl.'s Mem. in Support of Mot. for Summ.J. at 20, n. 18 citing Young Dep. at 165–168).

■ Libel and slander constitute two separate categories of defamation, a state law cause of action. Texas law defines slander as a "defamatory statement that is orally communicated or published to a

---

**17.** The trial court enjoys broad discretion in setting the amount of statutory damages. *See Broadcast Music,* 855 F.2d at 237 (recognizing that the trial court "enjoys wide discretion in setting the amount of damages for each work infringed" under section 504(c) of the Copyright Act); *Douglas v. Cunningham,* 294 U.S. 207, 210, 55 S.Ct. 365, 79 L.Ed. 862 (1935) ("[T]he employment of the statutory yardstick [for damages under the Copyright

Act], within set limits, is committed solely to the court which hears the case, and this fact takes the matter out of the ordinary rule with respect to abuse of discretion."); *Sara Lee Corp. v. Bags of N.Y., Inc.,* 36 F.Supp.2d 161, 166 (S.D.N.Y.1999) (noting that although the Lanham Act does not afford much guidance on statutory damages under section 1117(c), it specifically provides for "broad judicial discretion").

third person without legal excuse." *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995). In contrast, libel is "a written or printed defamation which tends to injure the reputation of a living person and thus expose him to public hatred, contempt, ridicule, or financial injury, or impeach his honesty, integrity, virtue or reputation." *Halbert v. City of Sherman,* 33 F.3d 526, 530 (5th Cir. 1994) (quoting *Sellards v. Express–News Corp.,* 702 S.W.2d 677, 679 (Tex.App.—San Antonio 1985, *writ ref'd* )). Whether an allegedly libelous and slanderous statement is defamatory is a question of law for the court. *See Shearson Lehman Hutton, Inc. v. Tucker,* 806 S.W.2d 914, 920 (Tex. App.—Corpus Christi 1991, *writ dismissed w.o.j.*). "Allegedly libelous or slanderous statements must be construed as a whole, in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement." *Diaz v. Rankin,* 777 S.W.2d 496, 499–500 (Tex.App.—Corpus Christi 1989, no writ).

Because falsity is an element of defamation, truth is a defense. *Randall's Food Markets,* 891 S.W.2d at 646 ("Truth is a complete defense to defamation."); *see also David L. Aldridge Co. v. Microsoft Corp.,* 995 F.Supp. 728, 741 (S.D.Tex.1998) ("The Fifth Circuit has interpreted Texas law as requiring the plaintiff to prove falsity as an element of a cause of action for defamation.").

■ The truth of Microsoft's statement that it filed such suits, including this suit, is not disputed in the summary judgment evidence. Given that this court has granted summary judgment as to infringement, and given that SWC did distribute counterfeit software, as well as a counterfeit end user license agreement, this court cannot conclude that any aspect of the website relating to defendants is false. Defendants' defamation claim fails as a matter of law.

## IV. CONCLUSION

This court GRANTS Microsoft's motion for summary judgment as to copyright and trademark infringement liability; GRANTS Microsoft's motion for summary judgment dismissing defendants' defamation counterclaim; and GRANTS Microsoft's motion for summary judgment as to attorney fees for copyright infringement. This court DENIES defendants' motion for summary judgment as to attorney fees and enhanced statutory damages.

Defendants are ORDERED to pay Microsoft $15,000 for each of the six separate copyright infringements and $50,000 for each of the seven separate trademark infringements, for a total award of $440,000.00. Defendants are to pay Microsoft its reasonable attorney fees attributable to the copyright infringement claims. Microsoft is ORDERED to supplement the record as to specific reasonable attorney fees and costs incurred in pursuing the copyright claim, and to identify any remaining issues in this case, within ten days from the date of this Memorandum and Order. Defendants will have ten days to respond.