**PHILIP MORRIS USA INC., Plaintiff,**

v.

**William W. LEE, et al., Defendants.**

**No. EP–05–CA–0490–PRM.**

United States District Court,
W.D. Texas,
El Paso Division.

April 10, 2008.

---

Bruce A. Koehler, Carl H. Green, Mounce, Green, Myers, Safi, Paxson & Galatzan, P.C., El Paso, TX, John C. Ulin, Los Angeles, CA, Samuel R. Watkins, Heller Ehrman LLP, Seattle, WA, for Plaintiff.

Robert A. Skipworth, Attorney at Law, Corey W. Haugland, James & Haugland, P.C., Christopher Allen Antcliff, Law Office of Chris Antcliff, El Paso, TX, Gerson M. Joseph, Plantation, FL, for Defendants.

Felipe Castaneda, El Paso, TX, pro se.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHILIP R. MARTINEZ, District Judge.

On this day, the Court considered the evidence presented by Plaintiff Philip Morris USA Inc. ("Philip Morris") and Defen-

dants William W. Lee ("Lee") and Felipe Castaneda ("Castaneda") at the bench trial held on December 17 and 18, 2007, in the above-captioned cause. On April 8, 2008, the Court entered a order granting summary judgment in favor of Philip Morris against Lee and Castaneda. *See* Docket No. 281. Specifically, the Court found Lee and Castaneda liable for violating the Lanham Act, 15 U.S.C. §§ 1114(1), 1124 and 1125(a)(1)(A), the Tariff Act, 19 U.S.C § 1526(a), the Texas Business and Commerce Code § 16.26, and common law unfair competition. *Id.* The Court also concluded that Castaneda willfully violated the Lanham Act. *Id.* Three issues survived summary judgment and proceeded to a bench trial including: (1) whether Lee willfully violated the Lanham Act; (2) whether Philip Morris is entitled to statutory damages based on Lee and Castaneda's liability; and (3) whether Philip Morris is entitled to recover attorney's fees in connection with the prosecution of its case against Lee. After careful consideration, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.[1]

## I. STIPULATED FACTS

Philip Morris and Lee stipulated to the following facts:[2]

1. Philip Morris is the registered owner of the following trademarks (collectively, the "Marlboro Marks") on the Principal Register of the United States Patent and Trademark Office, both of which are valid and incontestable pursuant to 15 U.S.C. § 1065:

| Registration Number | Registration Date | Trademark |
|---|---|---|
| 68,502 | April 14, 1908 | MARLBORO |
| 938,510 | July 25, 1972 | MARLBORO Red Label |

2. Philip Morris has used the Marlboro Marks in connection with its tobacco products for several decades.

3. Philip Morris has invested substantial time, effort, and money to advertise and promote the Marlboro Marks, resulting in widespread recognition and significant goodwill.

4. The Marlboro Marks have been federally registered for more than five years.

5. Philip Morris has filed copies of the Marlboro Marks' certificates of registration with both the Secretary of the Treasury and the United States Immigration and Customs Enforcement ("Customs").

6. Lee obtained a Ph.D. in agricultural economics from the University of Saskatchewan, Canada. Lee taught classes in agriculture statistics at Michigan State University. Lee was also a consultant to ConAgra Foods, Inc., where he worked on the development of the Healthy Choice line of food products.

7. In 2005, Castaneda pled guilty to federal criminal charges arising from his role in a large-scale, El Paso, Texas-based operation headed by Jorge Abraham ("Abraham") to import and distribute counterfeit and other contraband cigarettes in the United States.[3]

---

**1.** Rule 52(a)(1) provides:

In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.

FED.R.CIV.P. 52(a)(1).

**2.** Though Castaneda did not join in these Stipulations, the Court finds them to be supported by sufficient evidence.

**3.** Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice that Castaneda pled guilty to Count I of the Indictment on

He served a two-year term of imprisonment in connection with this conviction.

8. On August 19, 2003, Lee wired $39,000.00 to a Southeastern Cargo Services, Inc. ("SE Cargo") bank account maintained by John Tominelli ("Tominelli") as a down payment on the first shipment of 980 master cases of cigarettes.[4] On August 27, 2003, Tominelli purportedly inspected the 1,960 master cases of cigarettes purchased by Lee and Castaneda, which cigarettes were stored in a warehouse in Curaçao.

9. According to the inspection report, prepared by Tominelli, the 1,960 master cases of cigarettes were labeled "Marlboro KS Red Box, Made under authority of Philip Morris Products S.A. Neuchâtel Switzerland." Tominelli knew that the goods were labeled inaccurately when he prepared the inspection report. He knew that the cigarettes were actually Chinese-made counterfeit Marlboro cigarettes.

10. Shortly after receiving the inspection report, Lee wired an additional $210,450.00 to the SE Cargo bank account to pay for the first installment of 980 master cases of cigarettes pursuant to a Pro Forma Invoice, which set forth the terms of the transaction.

11. Lee and Castaneda executed all of the paperwork and paid all of the fees necessary to import the cigarettes into the United States, via the port of Houston, Texas, for delivery to El Paso.

## II. FINDINGS OF FACT

1. Customs sent Philip Morris a Notice of Seizure, dated November 19, 2003, informing Philip Morris that on or about October 8, 2003, Customs agents seized 978 master cases of counterfeit Marlboro cigarettes imported into the Port of Houston.[5]

2. The Notice of Seizure identified "Kagro Company, Inc." ("Kagro"), located in El Paso, as the importer of record for the seized shipment.

3. Before becoming involved with the underlying transaction, Lee and a man named Heeung Sil Park formed a business partnership, named P & L Mexicana. The business operated a Mexi-

---

December 17, 2004. Count I charged a violation of 18 U.S.C. §§ 371, 545, 2342(a) and 2320(a), to wit: Conspiracy to Smuggle Cigarettes into the United States, Traffic in Contraband Cigarettes and Traffic in Counterfeit Goods. *See* Docket No. 442, in cause number EP–03–CR–2294(2)–PRM. Section 371 makes it unlawful to conspire to commit an offense against the United States. Section 545 makes it unlawful to knowingly smuggle goods into the United States with the intent to defraud the United States. Sections 2342(a) and 2320(a) make unlawful to knowingly traffic contraband cigarettes.

On March 9, 2005, the Court sentenced Castaneda to a two-year term of imprisonment, a three year term of supervised release, and ordered him to pay a $100.00 special assessment and restitution in the amount of $3,510,468.00. *See* Docket No. 620 in EP–03–CR–2294(2)–PRM.

4. A master case of cigarettes contains fifty cartons. Each carton contains ten packs of cigarettes.

5. There appears to be a conflict between the quantity of master cases sent by Synergy Trading Group, Inc. ("Synergy") to Kagro Company, Inc. ("Kagro") and the quantity of goods seized by Customs on October 8, 2003. According to the Pro Forma Invoice, Synergy was to ship 980 master cases of cigarettes to Kagro as part of the first shipment. However, the Notice of Seizure indicates that Customs seized 978 master cases at the Port of Houston. The resolution of this incongruity bears no relation to the instant inquiry.

co-based chili farm and chili powder processing facility.

4. As a partner of P & L Mexicana, Lee became actively involved in the importation of chili powder from Mexico to the United States for resale.

5. Lee became acquainted with Castaneda when Castaneda telephoned him in 2003 after receiving Lee's telephone number from a mutual acquaintance. Through this acquaintance, Castaneda learned that Lee was seeking to undertake a new business opportunity.

6. At their first face-to-face meeting, Castaneda and Lee discussed becoming business partners. Castaneda suggested they consider going into business in the cigarette industry. Lee had no prior experience dealing with tobacco or tobacco-related products.

7. Castaneda told Lee that he had already found a customer looking to buy cigarettes, and requested Lee's help in locating a cigarette vendor, with which request Lee agreed.

8. Castaneda identified the buyer as Raul Martinez, III ("Martinez").

9. Lee did not learn of Castaneda's involvement in the illegal importation of counterfeit cigarettes until after Custom's seized the cigarettes in October 2003.

10. Lee and Castaneda executed a Partnership Agreement ("the Agreement") and named their business Kagro. According to the Agreement, Kagro's sole purpose was to manage and distribute cigarettes.

11. The Agreement listed a third partner, John K. Jon ("Jon"), the Managing Director of Benison International Corporation ("Benison"), an entity located in South Korea. Jon never signed the Agreement and did not become a partner of Kagro.

12. According to the Agreement, Lee was to contribute $70,000.00 to the partnership, Jon was to contribute $250,000.00, and Castaneda was to contribute only his services as a salesman.

13. To locate a vendor from which to purchase cigarettes, Lee searched an Internet website, www.alibaba.com. He knew this website to be a favorite among legitimate commodities importers.

14. On the website, Lee came across a sales advertisement for cigarettes posted by Synergy Trading Group, Inc. ("Synergy").

15. Synergy advertised cigarettes at lower price than other vendors who posted similar advertisements on the website.

16. Lee called the telephone number listed on the website for Synergy and spoke with Julian Balea ("Balea"), who identified himself as the owner of Synergy. Lee and Balea began to negotiate the terms of a potential sale.

17. During these negotiations, Balea introduced Ronald F. Morrison ("Morrison") to Lee and Castaneda as Balea's El Paso-based partner who would help close the sale.

18. Before agreeing to purchase cigarettes from Synergy, Lee and Castaneda asked Balea to send them sample packs of the cigarettes from Balea. Lee intended to use these sample packs to confirm the authenticity of the cigarettes in light of rumors that counterfeit cigarettes were often sold and distributed in the cigarette industry.

19. Balea sent to Lee and Castaneda five packs and color photographs of the cigarettes that he intended to sell to

Lee and Castaneda. Both the sample packs and the cigarettes in the photographs were labeled as Marlboro cigarettes.

20. After receiving one of the sample packs, Lee purchased a pack of authentic Marlboro cigarettes from a store and compared it to the sample pack.

21. The sample pack appeared to Lee to be identical to the pack he had purchased. He observed that both packs contained a provision which read "Made under authority of Philip Morris."

22. Lee testified that he has no education, training, or experience in distinguishing between counterfeit and authentic packs of Marlboro cigarettes.

23. Satisfied that the sample packs appeared to be authentic, Lee contracted, on behalf of Kagro, with Synergy to purchase cigarettes. The terms of sale were set forth in a Pro Forma Invoice, dated August 16, 2003.

24. According the Pro Forma Invoice, Kagro agreed to purchase a total of 1,960 master cases of Marlboro cigarettes for $509,600.00. This price amounts to $260.00 per master case, or fifty-two cents per pack.

25. Synergy agreed to ship the cigarettes in two equal installments of 980 master cases each. The cost for each shipment was $254,800.00.

26. Lee knew the cigarettes had to be inspected before they could be imported into the United States. Lee suggested that the SGS Group, a company he had used as an importer for P & L Mexicana, perform the inspection. However, Balea, Morrison and Castaneda urged Lee to agree to hire SE Cargo.[6] Lee acquiesced, and SE Cargo was listed as the inspector on the Pro Forma Invoice.

27. SE Cargo, acting through Tominelli, inspected the cigarettes on August 27, 2003.

28. On September 1, 2003, Lee received $254,800.00 from Jon, acting in his capacity of as an executive of Benison. Jon transferred these funds to Lee in exchange for 500,000 pounds of chili powder that Lee promised to deliver to Benison. No chili powder was ever delivered to Benison and the funds were never returned to Jon.

29. On September 2, 2003, Lee used the funds that he received from Jon to pay for the first shipment of cigarettes by transferring the money to an escrow account maintained by Tominelli.

30. On September 7, 2003, Lee asked Balea to provide him with a manufacturer's certificate of origin so Lee could verify the authenticity of the cigarettes, but Balea never provided such a certificate.

31. Lee and Castaneda agreed to an extended contract with Synergy, which provided that Lee and Castaneda would continue to purchase 980 master cases per month from Synergy for twelve months at $260.00 per master case.

32. Lee and Castaneda arranged to sell the cigarettes purchased from Synergy to Martinez for $345.00 per master case. Castaneda knew that $345.00 per master case was less than the

---

6. No evidence was presented to the Court with respect to why Castaneda joined with Balea and Morrison in urging Lee to hire SE Cargo, or to the degree to which Castaneda communicated with Balea or Morrison.

price which Martinez paid to other sellers.

33. Lee and Castaneda planned to use the money which they were to receive from Martinez as payment for his first purchase from Kagro to fund the second shipment of cigarettes from Synergy, and intended to repeat this cycle to pay for each succeeding monthly shipment. Based on this scheme, Lee and Castaneda stood to realize a profit of approximately $1 million over the course of the year, a nearly 400% return on their original investment.

34. Lee had never in his life encountered such a lucrative business opportunity. He admitted that he was "blinded" by the amount of profit Kagro would realize, describing such amount as "too much" money.

35. On more than one occasion, Castaneda told Morrison, Tominelli and Balea that he had contacts with Customs agents at the Port of Houston, who would ensure that the cigarettes were imported without any problems.

36. The counterfeit cigarettes shipped to Kagro were marked "Made under authority of Philip Morris Products S.A. Neuchâtel Switzerland."

37. The market price for authentic Marlboro cigarettes in the fall of 2003 was higher than the $260.00 per master case that Kagro paid. On or about October 20, 2003, Martinez purchased authentic Marlboro cigarettes directly from SE Cargo for $396.72 per master case, or $136.72 more than Kagro paid.

38. On October 8, 2003, Customs seized cigarettes shipped from Synergy and addressed to Kagro.

39. In a letter dated October 27, 2003, Lee demanded Synergy compensate Kagro for the damages resulting from the seizure of the counterfeit cigarettes.

40. In December 2003, Lee sent a letter to Customs requesting that he not be held liable for the October 2003 seizure.

41. On September 15, 2004, Lee sent a letter to Tominelli demanding that Tominelli return the $254,800.00 that Lee had placed in the escrow account.

42. At some point after the seizure, Lee contacted the FBI, seeking its assistance in recovering the $254,800.00.

43. After the instant lawsuit was filed against him in December 2005, Lee filed a cross-complaint against Balea, Synergy, Castaneda, Martinez, Morrison, Tominelli, and SE Cargo on April 27, 2006.

44. On December 14, 2006, the Court ordered Lee to show cause why his cross-complaint should not be dismissed for failure to serve the cross-defendants.

45. On January 3, 2007, Lee responded to the Court's order by requesting leave to amend his cross-complaint to drop all cross-defendants, except Balea, Synergy and Morrison. On June 29, 2007, Lee voluntarily dismissed, with prejudice, his claims against Balea, Synergy, and Morrison.

46. Lee never conducted any discovery against any of the cross-defendants.

47. Lee did not know the cigarettes were counterfeit.

48. Philip Morris did not suffer any lost profits as a result of the underlying events.

### III. CONCLUSIONS OF LAW

Philip Morris asserts that it is entitled to recover statutory damages and attor-

ney's fees as set forth in the Lanham Act given the Court's entry of summary judgment in its favor and against Lee and Castaneda. Pl.'s Am. Trial Br. 4, 10, 16. A "final judgment shall grant the relief to which each party is entitled." FED. R.CIV.P. 54(c). The Lanham Act provides for an award of statutory damages, and, "in exceptional cases," reasonable attorney's fees. 15 U.S.C. §§ 1116, 1117(a).

## A. Statutory Damages Against Lee and Castaneda

Philip Morris has invoked its right under the Lanham Act, 15 U.S.C. § 1117(c), to seek statutory damages in lieu of actual damages against both Lee and Castaneda. Pl.'s Second Am. Compl. 20.

Under § 1117(c), the Court has the discretion to award statutory damages between $500.00 and $100,000.00 per mark infringed. 15 U.S.C. § 1117(c); *Rolex Watch USA Inc. v. Meece*, 158 F.3d 816, 824 (5th Cir.1998). Where a defendant is shown to have willfully infringed a trademark, the statutory maximum increases to $1 million per mark infringed. 15 U.S.C. § 1117(c)(2); *see, e.g., Phillip Morris USA Inc. v. Marlboro Express*, No. CV–03–1161, 2005 WL 2076921, at *6 (S.D.N.Y. Aug. 26, 2005) (awarding $4 million in damages based on the defendants' willful use of four trademarks); *Philip Morris USA Inc. v. Banh et al.*, No. CV 03–4043, 2005 WL 5758392, at *7 (C.D.Cal. Jan. 14, 2005) (awarding $4 million in damages where the defendants willfully used four trademarks to sell counterfeit cigarettes); *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 501–02 (C.D.Cal.2003) (awarding $2 million where the defendants willfully infringed two trademarks).

### 1. Legal Standard for Willful Conduct

█ A defendant acts willfully " 'if he knows his actions constitute an infringement.' " *Taylor Made Golf Co. v. MJT Consulting Group*, 265 F.Supp.2d 732, 748 (N.D.Tex.2005) (quoting *Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir.1988)). Furthermore, several Circuit Courts of Appeal, as well as courts within the Fifth Circuit, have found willful conduct where a defendant acts with " 'reckless disregard for, or [with] willful blindness' " toward a trademark owner's rights. *Berg v. Symons*, 393 F.Supp.2d 525, 539–40 (S.D.Tex.2005) (quoting *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005)).[7] *See also Microsoft Corp. v. Wholesale Club, Inc.*, 129 F.Supp.2d 995, 1007 (S.D.Tex.2000) ("A finding of willfulness does not require actual knowledge, but rather willful blindness."); *A Touch of Class Jewelry v. J.C. Penney Co.*, No. CIV. A. 98–2949, 2000 WL 1224804, at *5 (E.D.La. Aug. 28, 2000) (quoting *Secura-Comm Consulting Inc. v. Securacom*, 166 F.3d 182, 187 (3d Cir.1999)) ("Knowing or willful infringement ... involves an intent to infringe or a deliberate disregard of the mark holder's rights.").

█ Willful blindness is a subjective inquiry which focuses on what a defendant suspected, and what he did with that suspicion. *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1151 n. 5 (7th Cir.1992). Indeed, the Fifth Circuit has held, in a non-trademark context, that a reasonable inference of willful

---

7. In addition to the Second Circuit, the Third, Seventh and Eleventh Circuits have also adopted the doctrine of willful blindness within the context of Lanham Act violations. *See, e.g., Gucci Am., Inc. v. Daffy's, Inc.*, 354 F.3d 228, 231 (3d Cir.2003); *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1148 (7th Cir.1992); *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir.1991).

blindness arises where the defendant is "subjectively aware of a high probability of the existence of the illegal conduct" and "purposely contrive[s] to avoid learning of the illegal conduct." *United States v. Scott*, 159 F.3d 916, 922 (5th Cir.1998) (finding a jury instruction on willful blindness proper in a fraud prosecution). Thus, evidence that a defendant purposely avoided learning of the illegal nature of his conduct may establish willful infringement within the meaning of the Lanham Act.[8]

Courts have considered the following factors in evaluating whether a defendant willfully violated the Lanham Act: (1) whether the same conduct underlying the Lanham Act violation also resulted in the defendant's conviction for trafficking counterfeit goods, *Marlboro Express*, 2005 WL 2076921, at * 6; (2) whether the defendant continued to import counterfeit cigarettes after Customs seized similar goods, *Banh*, 2005 WL 5758392, at *1; (3) the quantity of counterfeit goods imported, *id.*; (4) whether the defendant ceased using the counterfeit goods upon receiving notice of the infringing nature of his conduct, *Taylor Made Golf Co., Inc.*, 265 F.Supp.2d at 749; (5) whether the defendant believed in good faith that his use of a trademark was lawful, *Berg*, 393 F.Supp.2d at 548; (6) the purchase price of counterfeit goods, *Microsoft*, 129 F.Supp.2d at 1008; (7) whether the defendant attempted to verify the authenticity of goods, *Chanel, Inc.*, 931 F.2d at 1477; (8) whether the defendant boasted about his infringement conduct to others, *id.* n. 7; and (9) whether the defendant actively defended against the infringement claims, *Pitbull Prods. v. Universal Netmedia, Inc.*, No.07 civ. 1784 (RMG), 2007 WL 3287368, at *3 (S.D.N.Y.

Nov. 7, 2007) (noting that the defendant's failure to respond to a motion for default judgment supported finding of willfulness); *Philip Morris USA, Inc. v. Lin*, No. CV–03–8923 CAS, 2004 U.S. Dist. LEXIS 29903, at *20 (C.D.Cal. Oct. 25, 2004) (finding willful conduct where the defendant did not respond to the complaint or the plaintiff's motion for summary judgment).

### 2. Lee Did Not Willfully Commit Trademark Infringement

■ After careful review of the evidence, the Court finds that Lee did not willfully infringe the Marlboro Marks. While mindful of Lee's education and prior experience as an importer of goods into the United States, the Court finds that his knowledge of the importation of goods did not extend to the cigarette industry. Thus, Lee had no reason to suspect that the cigarettes were counterfeit based on the price advertised by Synergy. Moreover, his lack of knowledge does not equate to a deliberate attempt to avoid learning of the illegal nature of his conduct.

Additionally, there is no evidence that Lee continued to purchase or import counterfeit cigarettes after the seizure by Customs. In fact, Lee expressed concerns to Balea and Castaneda about the authenticity of the cigarettes sold by Synergy, and undertook efforts to verify their authenticity. These efforts included a request for a manufacturer's certificate of authentication and samples of the cigarettes. Balea complied with at least one of Lee's requests by sending photographs and sample packs of the cigarettes. While Lee could have undertaken more scrutinizing and exhaustive efforts to verify the authenticity of the

---

**8.** The Court has already concluded that Castaneda willfully violated the Lanham Act. *See* "Memorandum Opinion and Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment Against Defendants William W. Lee and Felipe Castaneda," 20–21, Docket No. 281.

cigarettes, the Court finds that his efforts do not establish willful blindness. Lee believed the samples were identical to authentic Marlboro cigarettes. Furthermore, there was no evidence available to Lee at that time connecting Balea, Synergy, or Castaneda to the importation of counterfeit goods. Finally, Lee has actively defended against Philip Morris's claims. Contrary to Philip Morris's argument, Lee's delay in taking judicial action to recover the funds he paid for the cigarettes does not necessarily demonstrate intentional infringement, and Philip Morris has not cited any caselaw in support of its argument. Thus, the Court finds that Lee believed he contracted to purchase legitimate cigarettes on Kagro's behalf, and thus he did not intentionally commit trademark infringement. It appears Lee misplaced his trust in business associates who may have taken advantage of Lee's eagerness to benefit from what appeared to be a lucrative business endeavor.

### 3. Amount of Damages

Philip Morris is entitled to statutory damages against both Lee and Castaneda given the Court's finding that they violated the Lanham Act by infringing the two Marlboro Marks. The Court has the discretion to award Philip Morris statutory damages against Lee in an amount between $500.00 to $100,000.00 per mark infringed. 15 U.S.C. § 1117(c)(2). Given its previous finding that Castaneda willfully violated the Lanham Act, the Court has the discretion to award damages against Castaneda between $500.00 and $1 million per mark infringed. *Id.* Philip Morris urges the Court to award the maximum amount of statutory damages. Pl.'s Mot. Summ. J. ¶ 55. In determining an appropriate amount of a statutory damage award, "[t]here is no substitute for the court applying its experience, wisdom and judicial acumen to the facts at hand." 3–14 GILSON ON TRADEMARKS § 14.03 (2007).

The Lanham Act does not provide the Court with guidance as to how to select an amount of damages from within the statutory range. In determining a reasonable amount of statutory damages under the Lanham Act, courts often find guidance in damage awards assessed under the Copyright Act. *Microsoft Corp. v. Software Wholesale Club, Inc.,* 129 F.Supp.2d 995, 1008 (S.D.Tex.2000) ("The factors relevant to the size of statutory damages under ... the Copyright Act are also appropriate to measuring damages under section 1117(c) of the Lanham Act."). The factors considered by courts in awarding statutory damages in copyright infringement cases include the defendant's profits, saved expenses, the plaintiff's lost revenues, and the defendant's state of mind. *Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F.Supp.2d 567, 584 (E.D.Pa.2002).

In cases involving counterfeit goods, courts have considered the size of a defendant's counterfeiting operations, and have been inclined to award the statutory maximum where a "large, commercial quantity" is involved. *See, e.g., Marlboro Express,* 2005 WL 2076921, at *21 (awarding the $1 million per infringed mark statutory maximum where the defendant imported 200,000 cartons as part of a "large counterfeiting operation"); *Lin,* 2004 U.S. Dist. LEXIS 29903, at *20–21 (awarding $1 million where the defendant's counterfeited nearly 31,000 cartons of cigarettes); *Castworld Prods., Inc.,* 219 F.R.D. at 499 (awarding $1 million where the defendants imported 40,000 cartons, characterizing such amount as a "large, commercial quantity").

The Court is also mindful that the Lanham Act's statutory damages provision was designed to ensure adequate compen-

sation and deter the use of counterfeit marks. *See Louis Vuitton Malletier & Oakley, Inc.*, 211 F.Supp.2d at 583 (citing S.Rep. No. 117, 104th Cong.1995) ("The purpose of § 1117 of the [Lanham] Act is to take the incentive out of counterfeiting and strengthen the civil remedies against counterfeiters."). The need to deter future infringement weighs in favor of a maximum statutory damage award. *Diane Von Furstenberg Studio v. Snyder*, No. 1:06cv1356, 2007 WL 3143690, at *6 (E.D.Va. Oct. 23, 2007); *Lin*, 2004 U.S. Dist. LEXIS 29903, at *21 n. 7.

There is no evidence that Lee or Castaneda received any profit or other monetary benefit as a result of their infringing conduct. Similarly, Philip Morris has offered no proof of actual damages or any other monetary loss as a result of Defendants' actions. The Court finds that Lee and Castaneda saved $136.72 per master case, or $133,985.60, by purchasing counterfeit, rather than authentic, Marlboro cigarettes.[9] In addition, Lee and Castaneda are liable for importing 49,000 cartons of cigarettes, based on the quantity seized by Customs, which amount is consistent with a large, commercial operation.[10] *See Castworld Prods., Inc.*, 219 F.R.D. at 499 (characterizing the importation of 40,000 cartons of cigarettes as a "large, commercial quantity"). The Court now turns to evaluate the individual conduct of each Defendant in order to determine an appropriate amount of statutory damages.

### a. Statutory Damages Against Lee

■ While Lee did not willfully commit trademark infringement, the evidence suggests that he acted less prudently than his education and prior business experience would dictate. For example, Lee admitted that he had doubts regarding the authenticity of the cigarettes. Indeed, these doubts lead Lee to request a sample pack of cigarettes and compare them to an authentic pack of Marlboro cigarettes. Lee also testified that, based on his suspicions, he asked Balea for a manufacturer's certificate of authenticity and challenged the use of SE Cargo to perform the inspection. However, Lee proceeded with the sale even though Balea never produced a manufacturer's certificate, and SE Cargo performed the inspection. Thus, the Court finds Lee acted negligently, though not necessarily willfully, by failing to take greater steps to resolve his suspicions regarding the authenticity of the cigarettes.

Based on the nature of Lee's conduct, the Court finds a statutory damage award closer to the high end of the statutory range for non-willful conduct as set forth in § 1117(c) is warranted. Specifically, the Court concludes that a statutory damage award of $100,000.00 per mark infringed, or $200,000.00 total, against Lee is reasonable. This amount will adequately com-

---

9. The amount saved by Defendants is based on the difference between the $396.72 market price per master case of authentic Marlboro cigarettes in the fall of 2003, and the $260.00 price per master case that Defendants agreed to pay Kagro during the same time period.

10. The Court declines to consider Philip Morris's assertion that "the massive scope of the importation scheme, in which Defendants planned to import tens of millions of counterfeit cigarettes, which were worth tens of millions of dollars, over the course of a year."

Pl.'s Am. Trial Br. ¶ 5. The Court has found Lee and Castaneda liable based only the quantity of counterfeit cigarettes seized by Customs in October 2003. Furthermore, Philip Morris has not identified any caselaw which supports using the quantity of goods or profit anticipated by a defendant in determining the amount of statutory damages. Thus, the Court finds it inappropriate to consider the quantity of cigarettes Lee and Castaneda anticipated importing or the anticipated amount of profit.

pensate Philip Morris for the intangible harm caused to its trademarks and sufficiently deter Lee, as well as others, from future counterfeiting activities.

### b. Statutory Damages Against Castaneda

 Based on his testimony, the Court finds that Castaneda participated in the purchase and importation of counterfeit cigarettes intending to make a quick profit. The underlying transaction was not the first time Castaneda counterfeited Marlboro cigarettes. *See Lin,* 2004 U.S. Dist. LEXIS 29903, at * 19–20 (finding the defendant's prior involvement in other counterfeiting efforts relevant to the deferent function of statutory damages). Castaneda testified that he sought to take advantage of the large profits he watched Abraham make by trafficking counterfeit cigarettes. While the fact of Castaneda's criminal conviction is irrelevant to the instant action,[11] the Court finds that from his prior involvement, Castaneda learned he could earn a large sum of money in a relatively short period of time by trafficking counterfeit cigarettes.[12] He recruited Lee, a man he had never met before, to join in his efforts. Castaneda suggested they venture into the cigarette industry; indeed, he had already located a buyer. Unlike Lee, there is no evidence that Castaneda ever doubted the authenticity of the cigarettes or took any steps to confirm their authenticity. Castaneda's representations that his contacts at Customs would ensure the cigarettes were imported without interference suggest that he acted in

knowing violation of the law. Thus, the Court agrees with Philip Morris that the "need to send a strong deterrent message is particularly acute" with respect to Castaneda. *See* Pl.'s Am. Trial Br. ¶ 17. Accordingly, it finds that statutory damages in an amount of $500,000.00 per mark infringed, or $1 million total, are reasonably necessary to compensate Philip Morris and strongly deter Castaneda from future infringement.

### B. Attorney's Fees Against Lee

#### 1. Legal Standard

 Under the Lanham Act, the Court has the discretion to award attorney's fees " 'in exceptional cases.' " *Seatrax, Inc. v. Sonbeck Int'l Inc.,* 200 F.3d 358, 372–73 (5th Cir.2000) (quoting 15 U.S.C. § 1117(a)). An exceptional case is one in which the defendant's conduct is " 'malicious, fraudulent, or willful,' " and shows " 'a high degree of culpability.' " *Martin's Herendi Imp. v. Diamond & Gem Trading USA,* 112 F.3d 1296, 1305 (5th Cir.1997) (quoting *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l Inc.,* 951 F.2d 684, 697 (5th Cir.1992)). "The prevailing party must demonstrate the exceptional nature of the case by clear and convincing evidence." *CJC Holdings, Inc. v. Wright & Lato, Inc.,* 979 F.2d 60, 65 (5th Cir. 1992).

 Intentional infringement may establish an exceptional case. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1127 (5th Cir.1991). However, a

---

11. While the Court recognizes that a defendant's prior conviction for trafficking counterfeit cigarettes may establish willful conduct, *Lin,* 2004 U.S. Dist. LEXIS 29903, at *19–20, Castaneda's conviction is not relevant to the instant inquiry, even though the conduct underlying the conviction took occurred prior the underlying transaction, because Castane-

da was not charged, convicted or sentenced until 2004, which occurred after the seizure in the instant action.

12. Since Castaneda pled guilty to offenses which require an intent to act unlawfully, the Court finds Castaneda knew his prior conduct was unlawful at the time he acted.

finding of willfulness for the purpose of awarding statutory damages does not bind a court in determining whether or not a case is exceptional. *Texas Pig Stands, Inc.*, 951 F.2d at 697; *see also CJC Holdings*, 979 F.2d at 65–66 (declining to adopt a rule that deliberate infringement per se establishes an exceptional case). "Even for suits involving counterfeit marks, an award of attorney's fees is premised on the defendant's 'knowing' conduct." *Microsoft Corp.*, 129 F.Supp.2d at 1011. However, intentional infringement may not make a case exceptional if the defendant used the trademark with a good faith belief that he was entitled to such use. *Sovereign Order of Saint John v. Grady*, 119 F.3d 1236, 1244 (6th Cir.1997) (cited in *Am. Registry of Radiologic Technologists v. Garza*, No. B-05-287, 2006 U.S. Dist. LEXIS 29826, at *20 (S.D.Tex. May 12, 2006)). "[L]ack of damages is an important factor in determining whether a case is exceptional." *Pebble Beach Co. v. Tour 18 I*, 155 F.3d 526, 556 (5th Cir.1998). In deciding whether to award attorney's fees, the Court should consider all of the evidence, including the testimony of the defendant, and appraise the defendant's motives. *Taco Cabana, Int'l, Inc.*, 932 F.2d at 1127.

### 2. Application

Philip Morris seeks an award of attorney's fees against Lee.[13] Based on the evidence and testimony, the Court declines to grant the requested relief because Philip Morris has failed to establish by clear and convincing evidence that the case against Lee is exceptional within the meaning of the Lanham Act.

The Court finds that Lee did not know the cigarettes were counterfeit. There is evidence Lee had concerns regarding the authenticity of the cigarettes and undertook efforts to dispel those concerns. While Lee's efforts to ensure the authenticity of the cigarettes may have been ultimately insufficient, his efforts demonstrate that Lee did not act maliciously, fraudulently, or willfully, and does not show a high degree of culpability, especially in light of his lack of experience in the cigarette industry. There is insufficient evidence to show that Lee had actual knowledge of Philip Morris's trademarks, or that with that knowledge, he intentionally purchased the counterfeit cigarettes. The Court finds Lee believed, in good faith, that the cigarettes purchased from Synergy were authentic. There is no evidence that he knowingly dealt with counterfeit goods, or that he intended to trade on Philip Morris's goodwill and reputation.[14] Furthermore, there is no indication Philip Morris suffered actual damages. *See Pebble Beach*, 155 F.3d at 556 (affirming denial of attorney's fee where the defendant did not intend to divert sales from the plaintiff and the plaintiff suffered no actual damages). As discussed *supra*, the Court declines to consider the "sheer volume of the transaction at issue," Pl.'s Am. Trial Br. ¶ 6, as evidence that the case is exceptional. Therefore, the Court, concluding that Lee did not act in bad faith or with the requisite level of culpability, denies

---

**13.** The Court has already concluded that the case against Castaneda is exceptional and that Philip Morris is entitled to an award of attorney's fees incurred in its prosecution against Castaneda. *See* "Memorandum Opinion and Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment Against Defendants William W. Lee and Felipe Castaneda," 23–24, Docket No. 281.

**14.** While Lee's belief may have been unreasonable, the standard for whether a case is exceptional focuses on the defendant's subjective state of mind, rather than what would have been reasonable under the circumstances.

Philip Morris's request for an award of attorney's fees against Lee.

## IV. CONCLUSION

Based on the above analysis of facts and legal principles, the Court finds that Lee should pay Philip Morris $200,000.00 in statutory damages and that Castaneda should pay Philip Morris $1 million in statutory damages. Philip Morris is hereby **ORDERED** to prepare a final judgment which reflects the Court's ruling, and submit the judgment to the Court for signature and entry by **no later than April 17, 2008.**